THOMPSON, J.
 

 The question presented in this case is whether the royalties received by the conservation department from shells, sand, and gravel should go to the credit of the general fund or to the conservation fund.
 

 Beginning with July 1, 1926, and ending March 23, 1927, there was collected by the department of conservation from sales of sand, gravel, and clam and oyster shells the sum of $22,707.29, which was turned into the state treasury to the credit of the conservation fund.
 

 Against this amount the commissioner of conservation drew for the expenses of his department the sum of $15,591.52, leaving as a balance to the credit of said fund from the sources aforesaid as of date March 23, 1927, the sum of $7,115.77.-
 

 On March 24, 1927, the Governor directed the state auditor to transfer the last above-stated amount from the conservation fund to the general fund and likewise to transfer all future collections by the conservation department from whatever source received to the general, fund until such transfers equaled the said sum of $15,591.52. The auditor was also instructed to place to the credit of the general fund all future collections from royalties on sand, gravel, and shells.
 

 This action of the Governor is stated to have been predicated on an opinion of the Attorney General to the effect that such revenues properly belonged to the general fund and not to the conservation fund.
 

 The conservation commissioner, having been notified by the auditor of his compliance with the command of the Governor, filed this application for an injunction restraining the auditor from transferring the collections from royalties on shells, sand, and gravel from the conservation fund to the general fund, and for a mandamus to said auditor, compelling him to restore the status quo of said conservation fund with respect to the shells, sand, and gravel royalties as it existed on the books of said auditor as of date March 23, 1927, before the order of the Governor was complied with.
 

 On a hearing of a rule nisi, the writs of injunction and mandamus were refused; hence this appeal by the plaintiff.
 

 The legislation with respect to the conservation of natural resources began in this state in 1908.
 

 In that year as the result of a conference of Governors in the White House the Legislature passed Act 144 which created the first commission on natural resources in this state.
 

 Following this, in 1910 (Act 154 of 1910) ar
 
 *309
 
 tide 229 of the Constitution of 1898 was amended so as to authorize the Legislature to levy a tax on severing natural resources from the soil, such as timber and minerals.
 

 In anticipation of the adoption of the amendment, the Legislature of 1910 levied a license tax on severing timber from the soil, extracting turpentine from standing trees, and producing oil, gas, sulphur, and salt from beneath the soil.
 

 This act created what is known as the “conservation fund” and provided that all moneys collected from the sources named should be placed in the treasury to the credit of said fund.
 

 In 1912 (Act 127) the conservation commission was created as a department of the state government for the purpose of the protection, management, and conservation of the oyster fields and water bottoms of the state; to protect the birds', fish, shell fish, and wild quadrupeds of the state and the natural and mineral and forestry resources of the state; and to see that all laws relative thereto were enforced.
 

 Section 4 of said act provides that a fund to be known as the “conservation fund” is hereby established and all funds collected by the conservation commission as herein provided for shall be paid in the state treasury to the credit of said fund, a record of said payments being made by the state auditor and acknowledgment thereof sent to the conservation commission.
 

 It was further provided that all expenditures should be made out of the said fund by the warrant of said conservation commission drawn on the state auditor.
 

 It was further provided that any surplus funds existing after the current annual expenses are provided for may be used for the purpose of game, oyster, and fish propagation and conservation.
 

 On January 20, 1913, the conservation commission, as created under the Act of 1912, assumed control of the water bottoms of the state and adopted a resolution providing that no person, firm, or corporation shall remove or take from the water bottoms of the state any material whatsoever without first securing pérmission from the conservation commission. The resolution further provided that a royalty shall be paid to the conservation commission on all material such as sand, gravel, oyster, and clam shells at the rates therein fixed.
 

 The resolution as passed pursuant to Act' 258 of 1910 and section 2 of Act 127 of the year 1912, declaring all water bottoms to be the property of the state and under the supervision of the conservation commission.
 

 In 1914 the conservation commission was authorized and empowered to grant the right and privilege to any person, firm, or corporation to take oyster shells or shell deposits from the shell reefs of the state and to fix the minimum price per cubic yard for such shells or shell deposits for which such right or privileges may be sold and granted.
 

 In 1916 the conservation commission was reduced to one head to be known as commissioner of conservation who was invested with all of the authority, power, and jurisdiction theretofore belonging to the conservation commission.
 

 It is contended by the Attorney General that the only right or privilege which has been granted to the conservation commission is the right to authorize the taking of shells and shell deposits from the shell reefs of the state along the Gulf Coast and that the conservation department has no jurisdiction over sand, shells, and gravel which may be dredged or otherwise removed from the waters and beds of any stream or body of water in the state.
 

 It is quite true that Act 42 of 1914 deals with oyster shells and shell deposits from the shell reefs along the- Gulf Coast and makes no mention of other waters or of sand
 
 *311
 
 and gravel, but Act 127 of 1912, recreating the conservation commission, expressly confers upon that commission the protection, management, and conservation of the oyster fields and water bottoms of the state; to protect the birds, fish, etc., and the natural and mineral and forestry resources of the state. We think this language broad enough to take in all of the natural resources of the state, including sand, gravel, and shells wherever situated or located in the state.
 

 Sand,'gravel, and shells owned by the state clearly fall under the designation “natural re- . sources” and passed under the jurisdiction and control of the state department of conservation without express mention to that effect.
 

 When we take into consideration all of the acts of the Legislature upon the subject-matter of conservation, there is left no room for doubt that the purpose was to place under the control and jurisdiction of the conservation commission all of the natural resources whether located on land or water or beneath the surface of the soil or water and whether alive or inanimate.
 

 The Legislature has not sought to place the natural resources here in question under the control of-any other department of the state' government and no sound reason is offered to show a purpose to leave such resources out of the control and jurisdiction of that department to which they naturally and inherently belong.
 

 But if there were any doubt on that subject, the state at this late date and in this proceeding cannot question the authority of the conservation commission to grant the permits to take the shells, sand, and gravel under consideration and to collect the royalties therefrom.
 

 This authority has been exercised since the year 1913 without question or protest on the part of an officer of the state. And even now in this suit the state is demanding that the royalties collected by the conservation commission be turned into the general fund thereby acquiescing in and recognizing the authority and jurisdiction by which the fund in controversy was realized.
 

 However, be that as it may, in so far as the-present proceeding is concerned the real issue is as stated in the very beginning of this opinion.
 

 As we have already noted, the first move towards conservation and the first levy and collection of revenues from natural resources' began in the year 1910 and at the very beginning of such legislation a particular fund was named and designated into which all such revenues should be credited and against which the expenses of conservation should be-charged. Since that date practically every act of the Legislature which sought á tax license 'or any kind of revenue' from the natural resources has in express terms provided that such tax, license, fee, or other' designated revenue, however collected and by whomsoever collected, should be placed to the credit of the conservation fund, except in a very few instances where specific portions of such revenues were specially dedicated to purposes-other than those pertaining to conservation..
 

 Every appropriation made b^ the Legislature for the department of conservation beginning with the year 1914 has been made out. of the special conversation fund and in connection with the appropriation it was provided that any unexpended revenue of the department of conservation, in excess of the appropriation remaining in the state treasury at the close of each fiscal year, shall be transferred to the general fund by the state auditor and state treasurer not later than December 31st of each year.
 

 It is admitted in the agreed statement of' facts that the royalties from sand, .gravel, and shells from 1913 to 1920 were paid into the conservation fund, but that subsequent to-1920 under an opinion by Assistant Attorney
 
 *313
 
 General Hall the said character of funds was transferred to the general fund, the transfer not being made, however, until the end of the calendar year.
 

 In September, 1925, the department of conservation was advised by an Assistant Attorney General that the royalty tax on sand, gravel, and shells should be paid into the conservation fund, along with license taxes received from oysters, shrimp, hunting license, etc.
 

 This opinion was later concurred in by the Attorney General, but he was of opinion that the statute upon which the department of conservation relied did not include any authority to collect the royalties, and that, by reason of that fact and the further fact of an agreement which permits all funds so deposited to be withdrawn from the conservation fund and placed in the general fund at any time the Governor may see fit to order, he (the Attorney General) did not think the royalties from sand, gravel, and shells should be-regarded as legitimately funds belonging to the department of conservation.
 

 The record does not disclose any such agreement as referred to by the Attorney General and it is very clear that any such agreement between the Governor and other executive officers of the state to which the commissioner of conservation was not a party could not be binding on him.
 

 Our conclusion therefore is that the sand, gravel, and shell deposits of the state form a part of the natural resources of the state; that they are under the jurisdiction and control of the commissioner of conservation until withdrawn therefrom by proper legislation ; and that, so long as the power to lease or to sell and to collect the royalties from exploitation of such natural resources is suffered by the lawmaking power of the state to be exercised by the conservation commissioner, all royalties collected therefrom properly belong to the conservation department, and should be credited to the conservation fund as provided and established by law, subject, however, to the provision requiring any unexpended balance of such fund at the end of the fiscal year to be transferred to the general fund not later than December 31st of each year.
 

 For the reasons assigned, the judgment appealed from is reversed and set aside, and it is now ordered that a peremptory mandamus and a writ of injunction be issued as prayed in plaintiff’s petition.