For the reasons assigned the judgment is affirmed.

O'NIELL, C. J., concurs in the decree.

27 So.2d 299

GORHAM et al. v. MATHIESON ALKALI WORKS, INC., et al.

No. 38054.

May 3, 1946.

Rehearing Denied June 14, 1946.

Jones, Kimball & Owen, of Lake Charles, and Louis H. Yarrut, of New Orleans, for defendant-appellant Mathieson Alkali Works, Inc.

Fred S. LeBlanc, Atty. Gen., and Robert R. Reid, 2d Asst. Atty. Gen., for Bogue Chitto-Pearl River Soil Conservation District, Intervener and appellant.

Harry P. Gamble, of New Orleans, for Commissioner of Department of Wild Life and Fisheries, successor to Department of Conservation, Intervener.

Preston L. Savoy, Cullen R. Liskow, Alvin O. King, A. J. Shepard, Jr., and Gilbert H. Graham, all of Lake Charles, for plaintiffs-appellees.

KENNON, Justice.

Plaintiffs sued to enjoin The Mathieson Alkali Works, Inc., from engaging in dredging operations in the bottoms of Lake Charles, Prien Lake and Indian Bay, in Calcasieu Parish, Louisiana, and to have cancelled two allegedly illegal contracts dated October 15, 1934, and September 27, 1944, respectively, between the Department of Conservation and the Mathieson Alkali Works, Inc., authorizing the removal of oyster and clam shells from these and other navigable water bottoms in southwest Louisiana. The petitioners allege that the conducting of the proposed dredging operations would result in making the named waters unsuitable for fishing and aquatic sports and would cause a sloughing off of plaintiffs' property, and lessen the beauty and usefulness of the lakes and bodies of water to the detriment of themselves and of all citizens of the State; that there is no statutory authority granting the Department of Conservation the right to lease navigable water bottoms for the purpose of removing clam and oyster shells; that, in the alternative, if such statutory authority does exist, it is violative of the constitutional prohibition against " * * * the alienation of the fee * * *" of such water bottoms; that the operations would result in taking plaintiffs' property without due process of law or adequate compensation; that the provisions of Act 170 of 1940 relative to the leasing of state lands are applicable and have not been complied with; and that, finally, the contracts had been secured by fraudulent misrepresentations regarding the proposed use of the shells.

The Mathieson Alkali Works, Inc., filed an exception of prematurity in that the petition alleges that a permit from the United States Government to dredge in the waters named was a prerequisite to such dredging and that same had not been secured by defendant corporation. Later, this corporation filed an exception of no right and no cause of action, and answered the petition admitting its intention to dredge in the named bodies of water under the authority of the contracts from the Department of Conservation, asserting that it intended to use the clam shells in its manufacturing plant near Lake Charles, Louisiana, for the manufacture and pro-

duction of agricultural lime, and prayed for the dismissal of plaintiffs' suit.

The Police Jury of the Parish of Calcasieu, as owner of a public park on the shore of Indian Bay, became a party plaintiff by intervention. The Commissioner of Wild Life and Fisheries and the Bogue Chitto Pearl River Soil Conservation District became parties defendant by intervention, resisting the claims of the plaintiffs.

After a hearing, the exception of prematurity was overruled and the district court issued a preliminary injunction.

At the trial, it developed that there were no oyster shells contained in the bodies of water in question and the issue of the validity of the 1934 contract covering oyster shells passed out of the case. The district court, in a thoroughly prepared written opinion, held void and unconstitutional the clam shell contract between the Conservation Department and the Mathieson Alkali Works, Inc., concluding that " * * * since the taking and removing of clam shells and clam shell deposits in the bottoms of the waters described * * * constitutes the taking and removing from these waters of a part of the beds, themselves, of such waters, * * *," the contract authorizing the same constituted " * * * an alienation in fee of a portion of the beds of these waters * * *," in violation of Section 2 of Article IV of the Constitution of 1921. The district court did not find it necessary to decide whether the contemplated dredging operations would

constitute a nuisance or cause irreparable injury to plaintiffs' abutting property.

All defendants have appealed.

The contract declared unconstitutional by the district court is dated September 27, 1944, and recites that in consideration of One Thousand Dollars ($1,000) cash, and the payment of four cents (4¢) per cubic yard royalty for all shells removed " * * * The Department of Conservation * * * does hereby lease, sell and grant, subject to the reservations and conditions hereinafter recited, unto The Mathieson Alkali Works, Inc., * * * the exclusive right and privilege of taking and removing clam shells and shell deposits from the following described areas, to-wit: All reefs and all water bottoms in Calcasieu and Cameron Parishes (excepting Calcasieu Lake, Grand Lake, Mallard's Bay and Moss Lake) * * *."

The principal question to be decided on appeal presents no controversial issue of fact and is simply whether or not the Department of Conversation was authorized by law to execute the contract above quoted from and, if so, whether such authorization was prohibited by the Constitution of the State of Louisiana, particularly section 2 of Article IV.

Recognition of the need in Louisiana for a program of conservation of the natural resources of the state grew out of a conference of Governors called by President Theodore Roosevelt at the White House in

1908. Act 144 of 1908 created a commission for the conversation of natural resources and directed that a report with reference to the preservation and conservation of the natural resources of the state be made by the commission to the General Assembly in 1910. Act 196 of 1910 continued the duty of the commission to report to the General Assembly biennially, and by Act 127 of 1912, the Conservation Commission became a department of the state government. An excerpt from this statute reads: " * * * the Conservation Commission of Louisiana is hereby constituted a department of the State government for the purpose of the protection, management, and conservation of the oyster fields and water bottoms of the State; to protect * * * the natural, mineral and forestry resources of the State * * * and, as such, it is hereby created a body politic or political corporation invested with all powers inherent in such corporation." It is further stated in the same section (2), in the fourth paragraph, " * * * Said Commission shall adopt by-laws * * * and regulations for comprehensive control of * * * mineral and soil and natural resources of the State which said * * * rules and regulations shall not be inconsistent with or contrary to the provisions of this act."

The regulations adopted in 1913 by the Commission provided that no material of any sort should be removed from water bottoms of the state without first securing the permission from the Conservation Com-

mission of Louisiana. The following are extracts from these regulations:

"Sand, Shells and Gravel

"Regulation fixing the tax on sand, gravel and shells. Adopted January 20, 1913, under authority of Section 2 of Act 127 of 1912, and Act No. 258 of 1910."

"* * * a royalty shall be paid to the Conservation Commission of Louisiana on all material removed or taken therefrom (the water bottoms of the state) at the following rates, to-wit:

"Sand, screened, per cubic yard, 1½ cents.

"Gravel, screened, or washed, per cubic yard, 5 cents.

"Gravel and sand, unscreened, per cubic yard 3½ cents.

"Oyster shells, per cubic yard, 5 cents.

"Clam shells, per cubic yard, 4 cents." (Parenthesis ours.)

■ Pursuant to the above regulations and the provisions of Act 127 cited supra of 1912 and Act 42 of 1914 (which specifically authorized and regulated the privilege of taking oyster shells and shell deposits), the Department of Conservation over the years has let contracts for the taking of oyster and clam shells. The only contest in connection with such leases which has reached this Court is the case of Irion v. Lyons, 164 La. 306, 113 So. 857. There, according to the opinion of Justice Thompson, the question presented was whether the royalties received by the Con-

servation Commission from shells, sand and gravel should go to the credit of the general fund or to the conservation fund. The Court found that during a period of shortly less than nine months (July 1, 1926 to March 23, 1927) there was collected by the Conservation Commission "* * * from sales of sand, gravel, and clam and oyster shells, the sum of $22,707.29, which was turned into the state treasury to the credit of the conservation fund. Against this amount the commissioner of conservation drew for the expenses of his department the sum of $15,591.52, leaving as a balance to the credit of said fund from the sources aforesaid as of date March 23, 1927, the sum of $7,115.77." The governor directed the State Auditor to transfer that sum along with other amounts to the credit of the general fund, the opinion of the Attorney General being that such sum properly belonged in the general fund. This Court ordered the State Auditor to transfer the fund back to the credit of the Conservation Commission, holding that the Legislature by Act 127 of 1912, had placed state owned lands, gravel and shells under the control of the Conservation Commission. This case was decided in 1927. The Court found that long acquiescence (1913 to 1927) in interpreting the Act of 1912 as authorizing the Conservation Commission to grant leases in accordance with the 1913 regulations of the Commission (pursuant to the 1912 Act) constituted an estoppel on the part of the State against questioning the authority of the Conservation Commission

to control and sell such material, using the following language: "* * * But if there were any doubt on that subject, the state at this late date and in this proceeding cannot question the authority of the conservation commission to grant the permits to take the shells, sand and gravel under consideration and to collect the royalties therefrom," and, in conclusion stated "* * * that the sand, gravel, and shell deposits of the state form a part of the natural resources *of the state; that they are under the jurisdiction and control of the commissioner of conservation until withdrawn therefrom by proper legislation;* * * * ." (Italics ours.)

Since the above opinion was published, nearly twenty years additional time has elapsed. Nine regular sessions and many special sessions of the Legislature have been held and despite the above quoted language of that opinion and the statement therein that "* * * the *power to lease or sell and to collect the royalties from exploitation of such* (sand, gravel and shells) *natural resources is suffered by the lawmaking power of the state to be exercised by the conservation commissioner* * * *,*," the Legislature has not seen fit to change the law nor to take from the Department of Conservation the then declared and then recognized power to grant leases of the type attacked in this suit. (Italics and parenthesis ours.)

It is not within the province of the Court to deny the right and authority of the Leg-

islature to exercise its constitutional responsibilities and powers. If it is unwise to grant leases under the 1912 act and if regulations and leases granted thereunder should require lessees to secure, before operations are undertaken in any particular area, a permit from a designated state official or agency with a view of prohibiting dredging in areas adjacent to municipalities and other places where loss to natural beauty and public use would outweigh the revenue to be derived, the correction must come through the Department of Conservation or by act of the Legislature, where the ultimate authority on the subject is vested by the Constitution.

■ We next consider the holding of the district court that the contract authorizing dredging for and removal of clam shells is void under the constitutional prohibition against an "alienation of the fee" of navigable water bottoms.

Conceding that dredging operations for shells may—and usually do—alter materially the physical set up and condition of the water bottoms in which the operations are conducted and that in some instances sand bars may be created and deep holes formed, nevertheless, the fact remains that when the operations cease and the dredge is moved to another locality, the fee title to the water bottom has not been affected by the operation and, therefore, when the state grants a lease for the removal of shells therefrom, it is not in violation of the provisions of the Constitution prohibiting against

the "alienation of the fee" of the bottoms of navigable waters.

The district court cited the case of Sequim Bay Canning Company v. Bugge et al., 49 Wash. 127, 94 P. 922, 923, 16 Ann. Cas. 196, as authority for the proposition that clam shells embedded in the land are so a part of the land that to authorize their removal constitutes an alienation of the fee. No other authority is cited. An examination of that case shows that a different point was involved. The plaintiff had leased certain seashore lands from the State of Washington for the cultivation and taking of clams therefrom. The defendants, who, apparently, had been accustomed to going to that portion of the shore and digging for clams, refused to recognize plaintiff's exclusive rights under the state lease, contending that plaintiff "* * * through the leases from the state, acquired no right to the possession of the clams superior to the rights of the public * * *" and "* * * inasmuch as the lands are at times covered by tidal waters and are uninclosed and vacant, the full common-law rights of navigation and fishing remain in the waters above the lands." The Supreme Court of Washington decided that, since it is common knowledge that clam digging must be done when the waters have subsided and that the common-law fishing rights inherent in the public under which defendants justify their trespass—did not include the right to dig clams along the shore—the state, as owner

of the land in fee, was authorized to grant the plaintiff a lease, for clam digging purposes, to the exclusion of the public and the trespassing defendants. The question of whether such a lease constituted an alienation of the land was not discussed.

Plaintiffs have contended that Act 127 of 1912 was superseded and repealed by Act 170 of 1940 and have quoted from an opinion of the Attorney General dated December 5, 1941, in which he ruled that the lease of state owned land, *other than water bottoms,* for the purpose of mining same, should be under the provisions of the 1940 act. Act 170 of 1940 provides for the leasing of State lands for trapping, hunting, grazing and other agricultural pursuits. The general rule is that when later acts do not specifically repeal earlier statutes on the same subject matter, they have the effect of superseding such previous laws only insofar as the provisions of the earlier acts are in conflict with the later expression of the legislative will. A reading of the 1940 act indicates that it is principally and primarily one governing *lands*. The penal clause reads "* * * It shall be unlawful for anyone to knowingly trespass upon such leased lands, and thereon to trap, hunt, graze stock or engage in other agricultural pursuits, * * *." The right of hunters and trappers and the public generally to continue normal use of the large bays, bayous and bodies of water in question, during the term of the "shell removing"

lease to The Mathieson Alkali Works, Inc., could hardly be questioned. A reading of the statute, including this section 9, discloses that the Legislature did not intend to include therein the leasing of navigable water bottoms for the removal of clam shells.

By exception, the defendants have urged that plaintiffs, as riparian owners, have no right to question the state's action authorizing dredging in the adjacent water bottoms. We do not consider it necessary to pass upon the issues thus raised, as plaintiffs in their petition, and for the purpose of the exception, all allegations therein are assumed to be true, allege that the operations complained of would result in actual physical damage to their riparian property.

The record shows that the application of The Mathieson Alkali Works, Inc., for a dredging permit has been withdrawn. The district court did not pass upon the question of whether or not the proposed operations would work irreparable injury and form the basis of an injunction and it is not in order for the appellate court to consider on appeal issues not previously decided by the trial court. Gordon v. Business Men's Racing Ass'n, 140 La. 674, 73 So. 768; State ex rel. Jones, Governor v. Edwards et al., 203 La. 1039, 14 So.2d 829. Under the circumstances of this case, justice will be served by dismissing, as of nonsuit, the petition, insofar as it alleges that operations under

the contract will constitute a nuisance and work irreparable injury upon abutting property.

The judgment appealed from is set aside. Plaintiffs' petition insofar as it alleges that operations will constitute a nuisance or cause damage to abutting property is dismissed as of nonsuit. All other demands are rejected. Costs to be paid by plaintiffs other than the Police Jury of Calcasieu Parish.

On Application for Rehearing.

FOURNET, Justice (dissenting from the majority ruling refusing to grant the rehearing).

This suit was instituted by William T. Gorham and thirteen other prominent citizens and taxpayers of Calcasieu Parish who own property abutting on Prien Lake, Indian Bay, and Lake Charles, on which they have built homes and other improvements, to have declared null and void and cancelled two contracts executed by the Department of Conservation selling, leasing, and otherwise transferring to The Mathieson Alkali Works, Inc., the exclusive right to dredge and recover oyster and clam shells from the bottoms of these waters as well as the bottoms of other navigable waters in Southwest Louisiana aggregating several thousand acres in area. Pending a determination of this litigation they sought to have the defendant enjoined from operating in these waters under these contracts.

The Police Jury of Calcasieu Parish, as the owner of a public park on the shore of Indian Bay, intervened in the proceedings joining with the plaintiff, while the Commissioner of Wild Life and Fisheries and the Bogue Chitto Pearl River Soil Conservation District intervened resisting the claims of the plaintiffs.

The first contract sought to be annulled and cancelled was executed on October 15, 1934, by the then Commissioner of Conservation, Robert S. Maestri, leasing, selling, and granting to The Mathieson Alkali Works, Inc., the exclusive right and privilege "of taking and removing oyster shells and/or oyster shell deposits from all reefs in Calcasieu and Cameron Parishes, excepting Sabine Lake," for a period of 15 years for a consideration of $1,000 in cash and 5¢ per cu. yd. for all shells removed, regardless of the amount removed, provided the amount paid the Department of Conservation would not be less than $2,000 a year, with the right of renewal for an additional period of 10 years. This contract was duly approved by the then Governor of Louisiana, Oscar K. Allen, and the then Attorney General, Gaston L. Porterie.

The second contract was executed on September 27, 1944, by the then Commissioner of Conservation, Jos. L. McHugh, and gave to "The Mathieson Alkali Works, Inc., its successors and assigns, the exclusive right and privilege of taking and removing clam shells and shell deposits" from the waters specifically designated

therein, including Prien Lake, Indian Bay, and Lake Charles, for a cash consideration of $1,000 and 4¢ per cu. yd. for the shells removed with a guaranteed yearly yield of $500. This contract is for a period of 5 years with the right of renewal for an additional 10 years.

In both of these contracts it is stipulated that they are executed under the authority granted the Commissioner of Conservation in Section 2 of Act 42 of 1914.

The trial judge, after overruling the exceptions of non-joinder of parties defendant and of prematurity, rendered judgment granting the preliminary injunction, and, on the merits of the case, in a well-considered opinion, rendered judgment in favor of the plaintiffs declaring the contract of 1944 to be null and void for the reason that the Department of Conservation was not authorized to execute clam shell contracts and, in any event, that such a contract is in violation of the constitutional inhibition against the alienation of the fee of the portions of the beds of these waters. He held that the contract of 1934 passed out of the case since the defendant corporation does not claim the right to dredge the waters involved in the suit for oyster shells, there being none in them.

The majority of the court concede, as they must, that the ownership and title to the navigable wat_r bottoms of this state, including the deposits thereon of oyster and clam shells, is in the state and, subject to the limitations in the constitution, such property can only be disposed of or otherwise alienated by or with the authority of the legislature and that the Conservation Commissioner, other than the constitutional mandate to *protect, conserve, and replenish* the natural resources of the state, has only such power and authority as has been specifically delegated to him by the legislature.

A mere reading of Act 42 of 1914, under which these contracts were executed, will show that it deals exclusively with oyster shell deposits from the shell reefs within the boundaries of the state and located in or on the borders of the Gulf of Mexico, and in no wise deals with clam shells. Obviously, therefore, in the absence of any further authority the Commissioner was without power or right to execute the contract of 1944 and it is null and void.

The majority opinion seeks to uphold the contract of 1944 under the authority of Act 127 of 1912 and the obiter dicta in the case of Irion v. Lyons, 164 La. 306, 113 So. 857, relative to the powers and duties of the Conservation Commissioner granted by that act.

A casual reading of the act of 1912 will show that the legislature in adopting it created and established a Conservation Commission (Section 1) and constituted it a department of the state government for the purpose of the *"protection, management, and conservation of the oyster fields and water bottoms of the State; to protect* the birds, fish, shell fish and wild quadrupeds

of the State, and *the natural and mineral and forestry resources of the State*" (Section 2), and while the act authorized the commission to adopt "rules and regulations" for the control of the wild life and mineral and forestry resources and other natural resources of the state not inconsistent with or contrary to the provisions of the act, no where in any of the sections of the act is there any provision authorizing the said Commission to sell, dispose of, or otherwise alienate any of the natural resources of this state. Moreover, while the Commission in that act was charged with the duty of carrying out the provisions of Acts 172 and 196 of 1910 and any other laws on the subject of conservation of the natural, mineral, and forestry resources of this state, the act itself otherwise deals exclusively with the wild life and game and fish and oysters of the state, which forms its primary object. (Italics mine.)

In the Lyons case, as pointed out in the original opinion, the question presented for decision was whether the royalties received by the Conservation Commissioner from shells, sand, and gravel should go to the credit of the general fund or to the credit of the conservation fund. *The legality of the contracts from which these funds were derived was not at issue.* It necessarily follows that such language as may have been used by the court in that case touching upon that subject was nothing more than obiter dicta and, as is so very aptly stated in American Jurispru-

dence, "When the right to do a thing depends upon legislative authority, and the legislature has failed to authorize it, or has forbidden it, no amount of acquiescence or consent or approval of the doing of it by a ministerial officer can create a right to do the thing which is unauthorized or forbidden." Vol. 43, page 69, Section 250, n. 4. The fact that the Conservation Commissioner was granted the *"management"* of the natural resources of the state in the act cannot be construed as giving him the authority to sell or otherwise dispose of these natural resources any more than a Police Jury, given the control and management of the courthouse and jail in its parish, has the right to sell or dispose of these buildings.

The only authority I have been able to find under which the Conservation Commissioner might be considered to be authorized to execute leases or grants involving the removal of *clam* shells is Act 170 of 1940, this being an act "to allow the State and its departments, agencies, subdivisions and institutions," to lease all of the public lands owned by it for any legitimate purpose other than for oil, gas, and other mineral purposes and development, in units of not more than 640 acres and for a period of not more than 5 years to the highest bidder after due advertisement. The mere fact that Section 9 of the act makes it unlawful for anyone to knowingly trespass upon lands leased under the authority of the act to trap, hunt, graze

stock or engage in other agricultural pursuits does not limit or circumscribe the object of this act any more than does the provisions found in Section 5 declaring any lease executed in violation of the provisions of that section to be null and of no effect or the provision that anyone violating the provisions of the act or attempting to circumvent them is to be deemed guilty of a misdemeanor, punishable as provided in Section 10. In other words, Section 9 does not in any way express or limit the object and purpose of the act, nor is it needed in aid of the interpretation or construction of any of the provisions found in its sections; for they are very clear and unambiguous.

For these reasons it is my opinion that a rehearing should be granted in this case and I respectfully dissent from the majority ruling refusing such rehearing.