379 So.2d 1117 (1979)
The CONTINENTAL GROUP, INC., Plaintiff-Appellee,
v.
J. L. ALLISON, Jr., et al., Defendants-Appellants.
No. 13961.
Court of Appeal of Louisiana, Second Circuit.
October 30, 1979.
Rehearing Denied February 29, 1980.
*1118 Wiener, Weiss, Madison & Howell by John M. Madison, Jr., James F. Howell and James R. Madison, Shreveport, for defendants-appellants, J. L. Allison, Jr., et al.
Wilkinson, Carmody & Peatross by W. Scott Wilkinson, Shreveport, for defendant-appellant, W. Scott Wilkinson.
W. T. Pegues, Mansfield, Curator ad Hoc for absent defendants-appellants.
Blanchard, Walker, O'Quin & Roberts by Robert Roberts, III, Joseph W. Milner and Randall S. Davidson, Shreveport, Wright, James, Hogg & Bleich by Howard W. Wright, Jr., Ruston, Colvin, Hunter, Brown, Plummer & Means by D. Scott Brown, Mansfield, for plaintiff-appellee.
*1119 Before PRICE, MARVIN and JONES, JJ.
En Banc. Rehearing Denied February 29, 1980.
MARVIN, Judge.
In this appeal of a declaratory judgment, we reverse the trial court and hold that under the peculiar circumstances of this case, a reservation of all mineral rights made in a sale of more than 90,000 acres in 1956 is to be construed as including solid minerals and as allowing defendants, who are successors in title to the reserving vendor, to strip-mine deposits of lignite coal under the lands.[1] We remand, however, to allow the trial court and the parties to determine how and to what extent a reasonable exercise of the servitude may be permitted by law. Delahoussaye v. Landry, 3 La.Ann. 549 (La.1848); La. Mineral Code; CC Arts. 772-779.
The predecessors in title of the litigants were producers of timber and manufacturers of timber products. The plaintiff corporation, as successor to the vendee in the 1956 sale, sought a declaration that each servitude created by the reservation on the several non-contiguous tracts comprising the 90,000 acres included only the right to explore for and exploit oil, gas and kindred minerals and did not include the right to strip-mine solid minerals.
The lower court did not make the declaration that plaintiff prayed for, but declared that the parties to the 1956 sale did not intend that the language of the reservation would include lignite or give defendants the right to strip-mine. In accord with a stipulation by the litigants the lower court also held that as to the noncontiguous tracts upon which nothing had occurred to interrupt the 10-year non-use prescription, several of the servitudes had expired as to all minerals. This part of the judgment is not complained of. Defendants contend that the servitudes on some tracts[2] have not prescribed because oil or gas production had prevented prescription from accruing and that defendants are entitled to stripmine the lignite. Plaintiff contends that oil and gas operations do not prevent accrual of liberative prescription as to solid minerals which may be recovered only by digging them from the ground.
In written reasons for judgment, the lower court stated that this case reasonably could have been decided either way and applied the rule of CC Art. 753 as expressed in Whitehall Oil Company, Inc. v. Heard, 197 So.2d 672 (La.App. 3d Cir. 1967), writ refused:
"Ultimately we concluded that, where the instrument could as reasonably be interpreted either way, the proper interpretation is that which least restricts the ownership of the land conveyed, as in the case of mineral servitudes (citations omitted). In so concluding we rely on the legislative mandate that `Servitudes which tend to affect the free use of property, in case of doubt as to their extent or the manner of using them are always interpreted in favor of the owner of the property to be affected.' LSA-Civil Code Art. 753. See McGuffy v. Weil, 240 La. 758, 125 So.2d 154."
In Huie Hodge Lumber Co. v. Railroads Land Co., 151 La. 197, 91 So. 676 (1922), a reservation of the iron, coal and other minerals was held to embrace only solid minerals and not to include oil and gas.
Huie Hodge observed:
"* * * Terms are to be understood in their plain, ordinary and popular sense, *1120 unless they have acquired a particular technical sense by the known usage of the trade. They are to be construed with reference to their commercial and their scientific import. This rule is of special importance when the question arises whether a specific mineral is included." 91 So. at p. 678. See also CC Arts. 1946-1962.
Conversely in Holloway Gravel Co. v. McKowen, 200 La. 917, 9 So.2d 228 (1942), a reservation of all the mineral, oil and gas rights was held not to include sand or gravel or the right to strip-mine. It was there said:
"`The term mineral' is not a definite one, capable of a definition of universal application, but is susceptible of limitation according to the intention of the parties using it, and in determining its meaning regard must be had, not only to the language of the deed in which it occurs, but also to the relative positions of the parties interested, and to the substance of the transaction which the deed embodies." 9 So.2d at 231.
Holloway Gravel noted La.C.C. Art. 1959:
"However general be the terms in which a contract is couched, it extends only to the things concerning which it appears that the parties intended to contract."
and La.C.C. Art. 1958:
"But if the doubt or obscurity arise for the want of necessary explanation which one of the parties ought to have given, or from any other negligence or fault of his, the construction most favorable to the other party shall be adopted, whether he be obligor or obligee."
Equally applicable, even retroactively where the Civil Code is silent or where the particular issue has not been squarely decided to the contrary, are the provisions of our recently adopted Mineral Code (LRS 31:1 et seq., Act 50 of 1974). See GMB Gas Corp. v. Cox, 340 So.2d 638 (La.App. 2d Cir. 1976). The rule of ejusdem generis, although not solely decisive, was applied in Huie Hodge (iron, coal and other minerals) and in Holloway Gravel (all the mineral, oil and gas rights) because in each case the term minerals was accompanied by other terms. See also River Rouge Min., Inc. v. Energy Resources of Minn., 331 So.2d 878 (La.App. 2d Cir. 1976), writ refused. The rule of ejusdem generis, however, here is of indirect assistance only because no terms accompany or qualify the eventual reservation all mineral rights. The purchaser, however, unsuccessfully attempted to restrict this term in earlier negotiations.
The trial court correctly allowed the introduction of evidence, testimonial and documentary, bearing on the question of the intent of the parties in 1956. Holloway Gravel Co., supra. We shall summarize this evidence and shall state why our conclusions differ from those of the lower court.

CIRCUMSTANCES BEFORE AND AFTER THE SALE ON MAY 25, 1956
An agreement to sell was signed by the parties on September 29, 1955. This agreement resulted from negotiations which began in late 1954 and involved about 93,000 acres at $95 per acre. Examination of title revealed some defects requiring curative work in about 1,100 acres. About 92,000 acres were sold in the May 25, 1956 sale by separate deeds of that date and of later dates. The 1,100 acres were the subject of a sale which occurred between the parties in 1963 after title defects had been cured. The seller was Mansfield Hardwood Lumber Company. We shall refer to the buyer sometimes as Continental.
Mansfield negotiated through its officers, A. S. Johnson, T. W. M. Long and Brown McCullough, and was represented by a Shreveport lawyer (Cook), now deceased. McCullough is also deceased. Johnson and Long testified.
Continental's negotiations were made primarily through Fitts, one of its officers and directors, and to a much lesser degree by Dyke, its president. A New York law firm (Newhall) and a New Orleans law firm (Milling) represented Continental. Two members of Newhall's firm, Oechler and Roberts, assisted Newhall to a slight degree. *1121 A member of Milling's law firm, Miller, provided some slight assistance to Milling. Dyke, Roberts, Oechler and Miller testified by depositions. The others are deceased. Some, but not all, of the writings pertaining to the sale were available and were introduced as evidence. Other writings were lost or destroyed.
An early draft of an agreement to sell was apparently drafted by or for Continental and was presented to Mansfield's Shreveport attorney in New York. This early draft, dated July 12, 1955, provided that the sale was to be "exclusive of mineral rights" and that "there shall be excepted and reserved to seller in each deed ... all mineral rights."
A letter from Newhall to Dyke, dated July 13, 1955, states that Mansfield's lawyer
"... did not want to read the contract this morning. He left LaGuardia on the ... plane for Shreveport and plans to examine the draft contract on his way down there and then talk with his clients."
This draft and Newhall's letter indicate that the term all mineral rights originated with Continental and not with Mansfield. The term began to acquire a more definite meaning within a few weeks.
On August 12, 1955, Milling forwarded to Cook a draft of the proposed act of sale which included this language:
"There is expressly excluded from this sale, and the vendors reserve, all mineral rights in the lands conveyed hereunder and all mineral rights, if any, that vendor may own in and to the lands above described which are affected by said leasehold instruments. The expression `mineral rights' does not include earth, sand and gravel."
In a letter of August 15, 1955 from Oechler in New York to Miller in New Orleans, there is enclosed a suggested revision of the draft of the agreement to sell which had been changed in part by Cook and in part by Oechler. The letter reads:
"One of these [changes made by Cook], granting rights of ingress and egress for mineral rights excepted from the sale, I shall wish to discuss with you more fully. The other, pertaining to trustee's fees, is satisfactory."
Cook's revision uses this language:
"There shall be excepted and reserved to seller in each deed and assignment all mineral rights, with the right of ingress and egress for the proper exploitation of the same."
On August 19, 1955 Oechler wrote Cook:
"I enclose herewith two copies of the revised Mansfield-[Continental] contract and of the revised act of sale and special mortgage ... You will note that I have put the mineral rights in the form in which we should like them * * *"
One of Oechler's changes was the addition of this paragraph:
"Notwithstanding any provision of this contract to the contrary, it is understood that this is a sale of timber lands and leasehold interests therein; therefore, if the descriptions contained in the schedules attached should cover any mill site or mill yard, or should include any town lots or houses thereon, they are not intended to be included herein."
This draft also contained the statement that Continental
"represents that it has dealt with no one other than Messrs. Johnson, McCullough and Long in connection with the transaction..."
In the draft of the act of sale enclosed with this letter, the pertinent Oechner (Milling) language read:
"There is expressly excluded from this sale, and the vendor reserves, all mineral rights ... with the right of ingress and egress for the proper exploitation of the same. The expression `mineral rights' does not include earth, sand and gravel." [Emphasis supplied.]
Cook and Oechler apparently discussed the fact that Mansfield would not agree that earth, sand and gravel would be excepted from the expression "mineral rights". Within a few days Continental obviously agreed that this exception would not be made if a damage provision was *1122 included. On August 23, 1955, Oechler wrote Cook in part:
"Pursuant to our telephone conversation today as to mineral rights, I would suggest that the last sentence of the first double spaced paragraph on page 3 in my draft of 8/19/55 be deleted [the sentence italicized and quoted above: The expression `mineral rights' does not include earth, sand and gravel] and that the following be added to such paragraph:
`The vendor, or its lessees, shall pay the vendee for all damage done to the timber, wood or other forest products or the property of the vendee on the lands conveyed hereunder and the lands above described which are affected by said leasehold instruments, in connection with the operations by the vendor or its lessee in the course of such exploitation and shall assume the payment of, and pay any taxes levied on all minerals due from such operations, or the increase in the value of the land, if any, caused thereby, or by the equipment placed thereon in connection with such exploitation.'
"The foregoing language is based on the clause that appears in the sample form of lease that was furnished to Mr. Fitts by his clients." Bracketed material supplied
Oechler apparently raised the question with Milling about the 10-year prescription for non-use as affecting a reservation of earth, sand and gravel. Milling wrote Oechler on August 26, 1955, referring to telephone conversations, that a reservation of sand and gravel would, in his opinion, constitute a servitude which would be prescribed by 10-years non-user. Milling in this letter discusses, among other cases, Huie Hodge Lumber Co. Milling was an attorney for the landowner in Holloway Gravel. In this letter Milling stated:
"In talking with you yesterday, I suggested that if [Continental] is to specifically recognize a reservation of sand and gravel rights, that you consider including a specific paragraph dealing with such rights, to make it clear that the rights are only for commercial production and further, insofar as is possible, to establish a different servitude with respect to sand and gravel from the servitudes established with respect to the minerals. The language I suggested is the following:
`Vendor also reserves the right to exploit for commercial production of sand and gravel, all deposits of sand and gravel in the lands conveyed hereunder and reserves such rights, if any, that the vendor may own to exploit for commercial production of sand and gravel, deposits of sand and gravel in the lands above described which are affected by said leasehold instruments with the right of ingress and egress for the proper exploitation of same.'
"If that clause were put in the deed, then, correspondingly, the parenthetical language in lines 4 and 5 of paragraph 1 on page 4 of the agreement should be deleted and the following substituted:
`and exclusive also of the right to commercially exploit sand and gravel deposits,'
"and the parenthetical language in the last line on page 4 should be deleted and there should be substituted therefor:
`and also the right to commercially exploit sand and gravel deposits,'
"If the language which would exclude sand and gravel from the definition of `mineral' is deleted and no other clause inserted, thus leaving the language as originally drafted, would it be possible, in the light of the way things have developed, to go on record that [Continental] does not concede that the term `mineral' does not include sand and gravel?"
After the 1956 sale Mansfield was dissolved and its remaining assets, including the minerals reserved in the sale, were conveyed to its stockholders and their assignees. In the events leading up to the 1963 sale some of the former stockholders or assignees were represented by a Shreveport attorney, Woods. Negotiations with Continental were conducted primarily by Long, a former officer of Mansfield, and by Woods. Negotiations for Continental were handled primarily by Boutwell, Continental's district *1123 woodlands manager. In a letter to Boutwell dated October 9, 1962, Long wrote:
"This is to advise you that I have contacted... Johnson and ... Woods, and it is agreed that we will meet with you at your office ... October 17 ...
"... it is understood by your company that this offer does not include any of the minerals connected with said lands."
On February 28, 1963, in a letter to Woods and Long, Boutwell wrote:
"Pursuant to my previous conversation with both of you I have now been authorized to offer ...
"This offer is subject to the following conditions:
"1. The vendors shall retain all oil and gas mineral rights that are owned by them under the said property."
On March 7, 1973 Long wrote to Johnson with a copy to Woods and Boutwell:
"This is to advise that ... I called Sam Boutwell ... with Continental... and told Sam it was... Woods' and my understanding when we held our discussion... that the mineral reservations would be exactly the same as the mineral reservations made in the sale ... in 1956.
"Sam said this was correct and .. is ... writing a letter to ... Woods and me advising that the restrictive phrase `oil and gas' should be eliminated from his letter offering to purchase the ... property."
On March 7, 1963, Boutwell, confirming Long's understanding, wrote to Woods and Long:
"Pursuant to our telephone conversation and general agreement ... we wish to revise the wording of paragraph one of our letter to you dated February 28, 1963 by striking out the words `oil and gas' thereby agreeing for the Mansfield stockholders to reserve all minerals in this pending transaction."
The 1963 reservation and damage provision eventually read exactly as the 1956 reservation and damage provision which is quoted in footnote one of this opinion.
The trial court found that Continental declined to accept Mansfield's offer in 1955-56 to "sell" the minerals with the land for the reduced price of $10 per acre and that Continental failed to "make any issue over the mineral reservation." On the basis of these findings and the testimony of Continental's forester, who before the sale was employed by Mansfield, the trial court concluded that neither Continental nor Mansfield was greatly concerned with the question of who owned the minerals because as a practical matter the minerals would revert to the landowner and that any oil and gas production would not present any great problem to forestry operations. We can agree that Continental declined Mansfield's offer to sell the land free of the mineral servitude (if one was made), but we cannot agree that these parties were not concerned with the reservation of all mineral rights, what the term included or excluded, and how the minerals would be exploited.
Even if we ignore the testimony of Long that Mansfield expressed, however facetiously, to Continental its concern about digging platinum, gold, rubies and diamonds out of the lands, the documentary evidence summarized above compels the conclusions that Mansfield and Continental negotiated as to whether the term all mineral rights would be restricted by other terms.
We conclude that as negotiations progressed, Mansfield and Continental considered the term all mineral rights to include more than oil, gas and kindred minerals. Continental recognized the broad and general scope of the term and attempted to have "earth, sand and gravel" excepted. Mansfield sought to avoid even this exception and sought to have expressly recognized its ingress and egress rights for the proper exploitation of all minerals. The essence of the documentary evidence pertaining to the term all mineral rights establishes that Continental was negotiating to limit the obvious broad and general scope of the term while Mansfield was negotiating *1124 to maintain its broad and general scope. The damage provision was added by Continental and agreed to by Mansfield as recompense for Continental's agreeing not to restrict or limit the term. All of the documentary evidence which was created primarily in 1955-56 at an inauspicious time, more than 20 years before this suit was filed, leads to the conclusion that Continental and Mansfield were "concerned", in different ways, of course, about the broadness of the term, contrary to what the lower court concluded.
The lower court also concluded that the language of the reservation was prepared by Mansfield and that all doubts arising from its language should be construed in favor of Continental. Again we cannot agree, because the evidence clearly establishes that the language finally employed was the product of negotiationsgive and takeby both parties. It would not be wrong to conclude, however, that the language of the damage provision was solely the product of Continental.
In its brief, Continental states that the testimony of its geological expert demonstrates: "... that the parties to the 1956 mineral reservation could not have intended to include every substance that at some indefinite future time or under some future circumstances might be classified as a `mineral,' because under the broadest definition of that term, all products taken from the earth are `minerals,' and these would include such materials as rock, sand, stone, gravel and even the earth itself ..."

THE REAL ISSUE
As Continental thereafter suggests, the real issue is not whether lignite is a mineral in the broad sense, but whether these parties intended that the servitude created in the 1956 sale would allow the strip mining of a solid mineral which had no economic significance until some 20 years later.
Continental's argument is concisely stated and emphasized in its brief:

"TO SUGGEST, . . . THAT 93,000 ACRES OF WOODLANDS, BOUGHT FOR THE EXPRESS PURPOSE OF SUPPLYING A PAPER MILL, COULD AT ANY TIME AND FROM TIME TO TIME IN THE INDEFINITE FUTURE, BE STRIPPED OF THE TREES AT THE WHIM OF A MINERAL OWNER FOR WHATEVER SOLID MINERAL OR OTHER SUBSTANCE IT MIGHT PROVE DESIRABLE TO MINE, WOULD HAVE BEEN TOTALLY BEYOND THE COMPREHENSION, INTENT AND KNOWLEDGE OF THE PARTIES. To recognize such a right would permit a mineral owner to preserve his rights by laying bare the land from time to time to recover not only lignite, which happens to be the solid mineral substance now of interest (notwithstanding its complete lack of economic significance at the time this trade was made), but also from time to time, as the market might dictate, whatever other mineral-type substances might become worth producing. These would include (under defendants' view of the case, at least) sand, gravel, soil, earth, clay, bentonite, iron ore, uranium, rock, stone and heaven knows what else." [Emphasis theirs]
The trial court concluded that:
"... had the purchaser known ... that every acre of the timberlands acquired ... would be subject to strip-mining, ... it would not have made the purchase.
"If such a severe servitude had even been slightly alluded to, [it is not] ... reasonable that anyone in his right mind would have gone through with the purchase, knowing that he would be severely handicapped in the growth of timber, the very object of his purchase ...
"I am convinced ... that the parties did not contemplate that the servitude would be so extensive and burdensome so as to practically destroy the use of the land by the owner ..." (Emphasis supplied.)
*1125 As we noted in River Rouge, supra, and as the expert testimony here establishes, strip-mining completely eliminates the surface owner's enjoyment of the portion of the property being mined. The material between the surface and the vein of lignite (25-200 feet in depth), called overburden, must be entirely removed by powerful machines before extracting and transporting the lignite.
In Holloway, supra, the court was construing in 1942, a reservation of all of the mineral, oil and gas rights made in a 1934 deed to McKowen, a farmer who purchased certain acreage along Thompson's Creek for agricultural and grazing purposes. The amount of acreage was not shown in the opinion. The court noted
that sand and gravel operations had been conducted several miles north of McKowen's property for several years but that no operations had been conducted in the vicinity of McKowen's property before the 1934 sale;
that McKowen and his vendors specifically discussed only the reservation of oil and gas rights; and
that photographic and other evidence revealed that the landowner would suffer a most onerous burden with attendant destruction of the surface and deprivation of the use of the land if the mining of gravel were allowed under the particular reservation.
The court stated that "any operation... for sand and gravel purposes would result in the utter destruction of its surface ... [and] would greatly impair, if not utterly destroy, McKowen's rights ..." that were intended to be protected by a "clause" in the deed which read:
"... the vendors ... shall always exercise and have due regard for the rights of the purchaser ... as owner of the land."[3]
The court also noted that the reservation was prepared by the vendor and that doubt or obscurity in its meaning would be resolved most favorably to the vendee. CC 1958. Other factors mentioned in Holloway Gravel were that the vendee, McKowen, did not consider that the land had any value whatsoever for sand and gravel purposes, that after he acquired the land he attempted to sell the property for an insignificant sum to the husband of his niece, and that the vendor did not make a claim to the proceeds from the sand and gravel operation by McKowen's lessee, which began in 1938, until two years later, in 1940. The court also commented that it would not take issue with the trial judge's conclusion that the parties would have specifically discussed sand and gravel in their negotiations if they had considered the sand and gravel to have potential value.
The lower court's conclusions and the argument of Continental generally tracks and parrots the language of River Rouge and of Holloway Gravel Co., both cited supra. This case presents much different circumstances. The lower court and Continental also fail to mention our statement in River Rouge, 331 So.2d at p. 881, that the digging of gravel is also strip mining, although of a lesser degree than the digging of lignite coal. Expert testimony here further elaborates on the strip mining and restoration process.
The topsoil is first removed by scrapers. A large dragline then removes the overburden (clay, sand, and other matter) down to the depth of the vein. The lignite vein is then fractured and mechanical shovels at the bottom of the pit load it for transportation to the facility using it as fuel. While this process is going on, bulldozers smooth the piles of overburden away from the mining operation to allow farm machinery to prepare for the replanting of flora. Some of the once removed top soil may then be distributed over the smoothed overburden in the ideal restoration process. Restoration *1126 has been accomplished with reasonable success in East Texas on lands not grossly dissimilar from North Louisiana lands. In any event, the opinion evidence conflicts as to the degree of restoration possible and the time necessary to achieve maximum restoration. We construe the evidence to the effect that substantial restoration, approaching, but perhaps not reaching, 100 percent of former timber productivity, is possible within 40 years. In one area on the West Coast of the U.S. with abundant rainfall and ideal conditions, it was recited that on the spoils of an old strip mine a paper company planted pine trees which grew 30 inches in one year.
Gravel is strip-mined in the same way and with the same machinery as lignite, at relatively shallow depths, although in most instances much larger and more powerful, but similar, machinery is employed in strip-mining lignite at great depths. It was also shown that the machinery available for this purpose now was available in 1956, although some of the much larger machinery was not then available. The customary method by which gravel was dug in 1956 was by strip-mining, also called open-pit mining.
We have summarized and quoted from documentary evidence which was compiled during the negotiations of these parties, primarily in 1955-56. When Continental's exception to the term all mineral rights (this expression shall not include earth, sand and gravel) was deleted and the damage provision was added, the conclusion is inescapable that the parties intended that solid material could be extracted by the open-pit or strip-mining process from beneath the surface of the lands in the exploitation of the servitude. Continental, by seeking to exclude gravel from the term all minerals, cannot contend in this case that gravel is not a mineral and that issue is not before us. Likewise, the issue of the interpretation of the damage provision is not now before us.
Other factors support the conclusion that these parties intended that the term all mineral rights and the damage provision contemplated the digging of solid substances from the ground by processes known at the time the servitude was created.
We noted in River Rouge some of the history and the character of lignite in DeSoto Parish. Some of the expert witnesses in River Rouge offered testimony here. We are also indebted to our learned and articulate brother below for his historical summary.
Before the second decade of this century early pioneers in DeSoto Parish were aware of several outcroppings of lignite in the Dolet Hills (Townships 11 and 12 North, Ranges 11 and 12 West) about 10 miles southeasterly of Mansfield, comprising an area of about 12 miles square. Although some effort was made around the turn of the century to use lignite as a fuel, these efforts were impractical and of no economic value.[4] Interest in the lignite deposits became dormant when oil and gas production became abundant in Louisiana but revived in the 1970s when domestic production of oil and gas substantially failed to meet the nation's need for energy. The geological pamphlet Louisiana Lignite, which was published by the Louisiana Department of Conservation in 1942 and which included surveys, showed in some detail the extent, depth and thickness of the lignite vein(s) in the area. Later exploration, but after 1956, supplied more detail, showing that veins of lignite 1-12 feet thick underly approximately 14,000 acres, approximately 10,500 of which were the subject of the 1956 sale *1127 and reservation at issue here. The lignite vein averages 5-6 feet thick.
In the data reproduced in the Louisiana Lignite publication in 1942, seven borings on plaintiff's lands in the Dolet Hills area revealed veins of lignite at these depths and thicknesses:

 LOCATION DEPTH THICKNESS
Sec. 5-11-11 59' 9'
 5-11-11 28' 12'
 8-11-11 98' 9'
 8-11-11 77' 8'
 9-11-11 55' 1'
 16-11-11 45' 7'
 1-11-12 143' 4'

Four visible outcroppings were noted in the 1942 publication:

 LOCATION DEPTH THICKNESS
Sec. 3-11-11 170' 6'
 7-11-11 170' 8'
 2-11-12 210' 10'
 1-11-12 207' 9'

Plaintiff itself has contracted with an electric utility company to strip-mine the lignite. This utility apparently plans to construct a 640 megawatt generating plant which will use lignite as a fuel. The facility will operate at about 60 percent of its maximum capacity. This operation will require the actual digging of about 60 acres per year but strip-mining will disturb 300-500 acres in moving the overburden from atop the lignite vein and in transporting the lignite. The surface acre disturbance will vary with the quantity of lignite in the vein (thickness and width) and with the depth of the vein below the surface. We deduce that no more than 1,000 surface acres will be disturbed in any one year for the operation in which plaintiff desires to participate.
In addition to the 93,000 acres acquired from Mansfield and the defendants, Continental owns more than 200,000 acres of timberland in North Louisiana and South Arkansas. From its total 300,000-plus acres, Continental annually harvests timber from non-contiguous tracts on 7,000 to 10,000 acres, sometimes selectively cutting and sometimes clear-cutting. Continental fully reforests (replants) the acres which it clearcuts. About 1/30 of its total acreage is harvested annually to allow full regrowth in approximately 30 years. Plaintiff's forester testified that plaintiff's harvesting and restoration program could work around a mining plan.
Continental argues in this respect that it is irrelevant what it does with its lands as a landowner, whether it devotes its efforts to pine plantations or to exploiting the lignite, more than 20 years after the 1956 sale, and that this is of no concern to defendants or to the court. We agree with this argument as a general proposition, but believe this is one of many factors for us to consider in determining whether the recognition of defendants' rights to strip-mine the lignite would be utterly destructive, unreasonably onerous or burdensome of Continental's rights as landowner and would allow the stripping of trees from 93,000 acres of woodlands at the whim of the mineral owner, as Continental contends and as the trial court erroneously concluded.
In other states where the strip-mining issue has arisen, several approaches have been taken. Texas, for instance, has a firm rule that mineral substances which can be extracted only by strip-mining belong to the surface owner and not to the mineral owner and that the mineral owner may not strip-mine unless the mineral grant expressly provides for the right to strip-mine. See Reed v. Wylie, 554 S.W.2d 169 (Tex. 1977). About 10 other states follow a similar rule, even when the mineral grant or reservation expressly includes the substance in dispute. See Rochez Brothers, Inc. v. Duricka, 374 Pa. 262, 97 A.2d 825 (1953). We are grateful to plaintiff's counsel for categorizing the several factors and for citing the many cases from other jurisdictions. The common thread in all of the cases, including Louisiana, is entwined around the intent of the parties at the time the grant was made, determined by one or more factors, and the obviously sound policy of not allowing the strip-mining process to utterly destroy or completely ravage the lands subject to the servitude.
As plaintiff observes, the principles of Louisiana law, particularly as expressed in River Rouge and Holloway Gravel Co. are *1128 generally consistent with the result produced in the cases in other states. The Louisiana principles are generally codified in our Mineral Code, which is applicable to all forms of minerals, oil and gas, and the right to explore for or mine and remove from land, the soil itself, gravel, or other substances occurring naturally in or as a part of geological formations underlying the land. LRS 31:4. Ownership of land includes all minerals occurring naturally in a solid state. § 5. A landowner may reserve his right to explore and develop his land for production of minerals. § 15. This right is a mineral servitude which is the right of enjoyment of land belonging to another for the purpose of exploring for and producing minerals. § 21. It must be exercised reasonably and with the obligation to restore the surface to its original condition at the earliest reasonable time (§ 22), and with reasonable regard for the rights of the landowner whose land is burdened with a mineral servitude. § 11. The respective rights of the landowner and the mineral owner are correlative. § 11. See Comment following, citing and discussing CC Arts. 777, 778, and 779. See also CC Arts. 772, 774. CC Art. 774 reads in pertinent part:
"The owner of the ... servitude... has the right to go on the estate which owes the servitude ... where it is necessary to construct ... works necessary for the exercise of the servitude, to deposit there the materials necessary for those works and the rubbish made thereby, under the obligation of causing the least possible damage and of removing them [the materials and the rubbish] as soon as possible.
"Nevertheless, if in the act establishing the servitude, it is said that the owner to whom it has been granted can not construct works in order to exercise it, or can only construct them in a certain manner, this agreement must be observed."
In River Rouge, we were construing a particular Bath Form oil, gas and mineral lease of common usage in Louisiana to determine whether that instrument granted the lessee the right to strip mine lignite. Our determination was made from the intent of the parties as revealed by or inferred from the instrument itself. Ejusdem generis was applied. We held that lease granted only the right to explore for and produce minerals of the same physical properties as oil and gas (oil, gas and all other minerals), i. e., those minerals that are produced in liquid or gaseous form by drilling wells into the subsurface.
Similarly, Holloway Gravel Co., in 1942, held a reservation of all of the mineral, oil and gas rights did not include the right to dig or strip-mine gravel. The parties specifically discussed only the reservation of oil and gas, not gravel. Ejusdem generis was applied. The court considered both the purpose for which the purchaser bought the land and the effect of the exercise of the servitude on the land (greatly impair, utterly destroy the landowner's rights).
Here the parties dealt with 92,000 acres, about 1/100 of which, at the most, may be affected each year. Mansfield's rights to explore for and produce gravel were expressly negotiated (as in Holloway Gravel Co., specifically discussed) when the reservation was made. The only known way to produce gravel in 1956 was the way in which gravel and lignite coal is now produced, by the open-pit or strip-mining process, where the overburden is removed to allow extraction of the material beneath the surface. It was contemplated that any exercise or exploitation of the mineral servitude might cause some damage to timber or other property of Continental on the lands conveyed. We are not called on at this juncture to decide what damages might be recoverable under the damage provision or what strip-mining operations would or would not be reasonable or permissible under the law. We are called on, however, and do decide that where the parties specifically discuss in 1955 whether the exploitation of gravel is allowed under a reservation of all mineral rights and delete language excluding gravel and add a damage provision, the right to exploit or strip-mine lignite in 1977 in a manner similar to the exploitation or strip-mining of gravel is included *1129 within the reservation, provided, of course, that the servitude has not prescribed and its exercise does not otherwise violate law or policy under the law.
Our mineral law sprang from the application of the Civil Code directly or by analogy to issues in cases involving minerals. LRS 31:3, Comment. A reservation of mineral rights is not a reservation of so many tons of coal or barrels of oil, but a reservation of the right to explore for and exploit for any mineral included in the reservation. Such a reservation is not void because of lack of certainty as to the thing reserved or because of violation of any public policy. Frost-Johnson Lumber Co. v. Salling's Heirs, 150 La. 756, 91 So. 207, 242 (1922). LRS 31:21. Plaintiff argues that parties to a broadly worded mineral sale or reservation should not be regarded as having contemplated the inclusion of a mineral substance having no foreseeable economic value [potential value as in Holloway Gravel] at the time of the reservation in the absence of an express intention to the contrary. We cannot agree. The very word explore long used with exploit in explaining the nature of the mineral servitude, whether oil and gas or solid mineralsimplies a venture into the unknown or uncertain. This is in the nature of a "hope" which may be sold or reserved. CC Art. 2451. The economics of mineral exploration and exploitation have always been uncertain and the fact that a particular mineral has no foreseeable economic value at the time a mineral reservation is made is but one factor to be weighed with other factors in determining what the parties intended. It was a factor in Halloway Gravel. It is a factor here, but to a much lesser extent because these parties bargained and negotiated about the scope of the term all mineral rights and eventually agreed that the term would not be limited, even as to gravel, and that a damage provision would be added to recompense, wholly or in part, the landowner for whatever it might suffer by reason of the exercise of the right of the servitude owner to all minerals.
In Delahoussaye v. Landry, 3 La.Ann. 549 (La.1848), defendant owned a servitude which allowed him to take wood from the lands of plaintiff. The servitude was created in 1809 and was not then onerous because the plaintiff's lands could support the servitude without deterioration. Some 20 years later defendant converted his farming operations from cotton to the production and making of sugar. The court found that the quantity of wood necessary for the manufacture of sugar could not have been in the reasonable contemplation of the parties at the time of the making of the 1809 contract, that the need for wood for sugar production had increased the burden on the landowner, might increase more, so that what was originally within the province of the parties might become a devastation and destroy the value of the burdened estate. The trial court restricted the defendant to the taking of a maximum of 35 cords of wood per year from plaintiff's property, which was deemed to be sufficient for defendant's operations, excluding the manufacture of sugar. The Supreme Court reversed and remanded:
"The subject is one of great importance in this portion of the State particularly, and we feel great reluctance in determining it without further lights. We shall leave the extent of this servitude, as to the quantity of wood and what wood is to be taken, open for further enquiry, and change the judgment appealed from in that particular. The parties themselves may perhaps render a further examination of this subject by a court unnecessary." 3 La.Ann. at p. 551
The Delahoussaye approach and result is certainly in accord with today's law and policy, as it has evolved since 1848, with regard to the correlative rights and obligations of the landowner and servitude owner. Mineral Code, Arts. 11, 21, 22.
Other factors bearing on the intent of the parties in 1955-56 have been considered, but we do not weigh them as heavily as does plaintiff. One factor is that in a petition for an income tax ruling in 1956 in connection with its liquidation, Mansfield *1130 referred to its remaining assets as including oil and gas mineral rights. Another factor is the absence in the minutes or corporate internal records of Continental of any reference to lignite or strip-mining and the repeated use of terms supporting its intentions for expanding its timber production and manufacturing operations. Another factor is that defendants never sought to deal with the solid minerals and that on about six occasions Continental dug or allowed the digging of sand or gravel or similar material. Continental donated sand to a country club and sold iron ore (road base material) to public bodies or to contractors doing public works. Defendants denied any knowledge of these activities and plaintiff's witness who testified about the activities, stated that to his knowledge Continental had not notified defendants about the activities and that there was no way for the shareholders to know of this unless they had gone on the land. The fact that Toledo Bend Lake inundated some 15,000 acres of plaintiff's lands without action by defendants, is also not persuasive.
We have considered these and all other factors bearing upon the intent of the parties. Our conclusion, summarized here, is not changed:
Mansfield and Continental negotiated about the broadness of the term all mineral rights. Continental wanted to restrict the term to exclude earth, sand and gravel. Mansfield wanted to keep it unrestricted.
The digging of earth, sand and gravel certainly was contemplated as being included in the term all mineral rights. Lignite and other solid minerals are not excluded and the digging of lignite must be deemed to have been within the contemplation of the parties.
Recognition that the servitude includes such things as lignite does not permit the servitude owners to exercise their rights arbitrarily or devastatingly or without due regard for the rights of the landowner, but in a reasonable way and in accord with law.
These conclusions, however, raise the issue of whether oil and gas operations on some tracts of the 90,000 acres affected by the servitude have interrupted prescription as against the digging of coal.
"Prescription of nonuse is interrupted by the production of any mineral covered by the act creating the servitude. The interruption occurs on the date on which actual production begins and prescription commences anew from the date of cessation of actual production." LRS 31:36
"An interruption of prescription applies to all types of minerals covered by the act creating the servitude and to all modes of its use." LRS 31:40
We have held that the Mineral Code is to be retroactively applied where the particular issue has not been clearly resolved to the contrary by litigation. § 3, GMB Gas Corp. v. Cox, supra, 340 So.2d at p. 640. The prescription issue here was not clearly resolved before adoption of the Mineral Code. Scholarly expert witnesses dispute in this record what the law was on this issue before the Mineral Code. We follow the above authorities and hold oil and gas operations have here interrupted prescription as to the digging of solid minerals.
As to those lands upon which the parties have stipulated that nothing has occurred to interrupt prescription, which lands are described in the judgment, we agree that prescription has not been interrupted. That portion of the judgment is affirmed.

DECREE
As to those lands upon which oil and gas operations have interrupted prescription, described in Appendix A to this opinion, we reverse the lower court and declare and decree that the servitude created in the reservation-damage provision quoted in footnote one of this opinion is a right of enjoyment of the lands described for the purpose of exploring for and producing minerals, in solid, liquid or gaseous form, and whether produced by drilling, mining or digging, including strip-mining, but in a manner contemplated by law.
In order that a determination might be made of whether the projected exercise of *1131 the servitude by the strip-mining of lignite by the servitude owners will be in accord with law, this case is remanded for further proceedings.
Costs here and below are assessed one-half to plaintiff and one-half to defendants.
AFFIRMED in part, REVERSED in part, and REMANDED.

APPENDIX A
Lands upon which prescription has been interrupted:

DESOTO PARISH
(1) Township 10 North, Range 11 West
Section 3E/2 of NW/4, W/2 of NE/4

Township 11 North, Range 11 West
Section 34SW/4 of SE/4, SW/4
(2) Township 10 North, Range 11 West
Section 4W/2 of W/2
Section 5E/2 of Section
Section 9NW/4 of NW/4, S/2 of NW/4, NW/4 of NE/4, S/2 of NE/4, S/2 less SE/4 of SE/4

Township 11 North, Range 11 West
Section 32SE/4
Section 33W/2 of SW/4, SW/4 of NW/4
(3) Township 11 North, Range 11 West
Section 2NW/4, W/2 of SW/4, NE/4 of SW/4 less and except that part lying North and East of meander of the Lake
Section 3N/2, SE/4, E/2 of SW/4
Section 4N/2 less 2 acres in SE/4 of NE/4 owned by DeSoto Parish School Board and described as commencing 14 chains North and 13 chains West of Northeast corner of SE/4 of Section 4-11N-11W, running thence North 5 chains, thence West 4 chains, thence South 5 chains, thence East 4 chains to the place of beginning

Township 12 North, Range 11 West
Section 33SW/4 of SE/4, SW/4
Section 34S/2 less N/2 of N/2 of SW/4 sold to C. W. Smith
(4) Township 11 North, Range 11 West
Section 5NW/4 of NW/4
(5) Township 11 North, Range 11 West
Section 6SW/4 of SE/4
(6) Township 11 North, Range 11 West
Section 8Fractional E/2 of SW/4 being that part lying South of the Dolet Grant
Section 16S/2 of SW/4 of NW/4, SW/4
Section 17NW/4, W/2 of NE/4, SE/4, N/2 of SW/4
Section 18S/2 of SW/4
Section 19NW/4, W/2 of NE/4, SE/4 of NE/4, N/2 of SE/4, SW/4 of SE/4, E/2 of SW/4
Section 20S/2 of NW/4, W/2 of NE/4, N/2 of SE/4, N/2 of SW/4

Township 11 North, Range 12 West
Section 24NE/4 of NE/4
(7) Township 11 North, Range 11 West
Section 11That portion of SW/4 in Fieldwide Unit CHLK RENSU dated 7-18-72
(8) Township 11 North, Range 11 West
Section 15E/2 of SW/4
(9) Township 11 North, Range 12 West
Section 1S/2 of NW/4, S/2 of SE/4, SW/4 less 1 acre sold to Grove Hill Baptist Church by deed dated May 5, 1947, described as: Beginning at SW corner of Section 1-11N-12W, running East 110 yards, thence North 68 yards to public road, thence in SW direction along South side of said road to a point 25 yards North of SW corner of Section, thence South along Section line 25 yards to place of beginning
Section 2NE/4
*1132 Section 12Lot 6, being Lots 1 and 3 inside Dolet Grant, and fractional E/2 of NW/4 inside Dolet Grant
(10) Township 12 North, Range 11 West
Section 3Fractional W/2 of SE/4 of Section 3 excepting 10.45 acres of said fractional W/2 of SE/4 of Section 3 lying along the West bank of Bayou Pierre, said 10.45 acre strip reserved to follow the meanderings of said Bayou Pierre, in such fashion that the width of said strip East and West shall be the same throughout the length thereof; NE/4 of SW/4, W/2 of SW/4
Section 4N/2 of SE/4, SE/4 of SE/4
Section 9S/2 of NE/4
Section 10W/2 of W/2
(11) Township 12 North, Range 11 West
Section 7SE/4 of NE/4
(12) Township 12 North, Range 11 West
Section 20S/2 of NE/4, NE/4 of SE/4
Section 21SW/4 of NW/4, N/2 of S/2
(13) Township 12 North, Range 11 West
Section 30S/2 of SW/4, NW/4 of SW/4
Section 31N/2 of NW/4
Township 12 North, Range 12 West
Section 25SE/4
Section 35N/2, SW/4
Section 36NW/4, W/2 of NE/4
(14) Township 12 North, Range 12 West
An undivided three-fourths (¾) interest in:
Section 1South ¾ of SW/4 of SW/4
Section 11NE/4 of NE/4
Section 12NW/4 of NW/4
(15) Township 12 North, Range 12 West
Section 3SE/4 of NW/4, NW/4 of NE/4, N/2 of SW/4 of NE/4 less and except one acre described as beginning at SE corner of N/2 of SW/4 of NE/4, thence run West 140 yards, thence North 35 yards, thence East 140 yards, thence South 35 yards to beginning; N/2 of SW/4

NATCHITOCHES PARISH
(16) Township 11 North, Range 6 West
Section 26W/2 of SW/4

SABINE PARISH
(17) Township 6 North, Range 10 West
Section 4An undivided 22.75/115 interest in: W/2 of NE/4, NW/4, N/2 of SW/4, SE/4 of SW/4, and SW/4 of SE/4
(18) Township 6 North, Range 10 West
Section 19N/2 of NE/4
(19) Township 6 North, Range 12 West Section 2That part of NW/4 lying South of LaNana Bayou, W/2 of NE/4 lying South of LaNana Bayou, S/2 of SE/4 of NE/4, S/2 of Section, all of the above located in Lot No. 3 of the LaNana Grant
Section 11All of Section 11, less and except a tract beginning at a point 10 feet East of the SE corner of W/2 of SE/4 of SW/4, thence running North 20 degrees West a distance of 400 feet to the South boundary line of Many-Pendleton Ferry Highway, thence in a Southwesterly direction along the South side of said highway as the highway meanders to the intersection of the South line of the above described 20 acres, thence due East a distance of 650 feet to point of beginning, containing 2.75 acres, more or less, all of the above located in Lot No. 3 of the LaNana Grant
(20) Township 6 North, Range 13 West Section 12S/2 of SE/4 lying outside of LaNana Grant
Section 13E/2 of NE/4
(21) Township 7 North, Range 10 West Section 28S/2 of N/2, and 1 ½ acres in SE corner of NW/4 of NE/4, N/2 of SE/4, SW/4 of Section
*1133 (22) Township 7 North, Range 10 West Section 32An undivided 22.75/115 interest in: NW/4 of SE/4, S/2 of SE/4, SE/4 of SW/4
(23) Township 9 North, Range 12 West
Section 21SE/4 of Section
Section 22E/2 of W/2, N/2 of NE/4
Section 27W/2 of Section, NE/4 of Section
Section 28NE/4 of Section, S/2 of SE/4
Section 34NW/4 of Section, W/2 of SW/4

WINN PARISH
(24) Township 12 North, Range 3 West
Section 15S/2 of S/2, NE/4 of SW/4
Section 16All of Section except W/2 of SE/4
Section 17NE/4 of SE/4
Section 22NE/4 of NW/4 less 10 acres in SW corner, SE/4 of NW/4, W/2 of NE/4, NE/4 of NE/4
(25) Township 12 North, Range 3 West
Section 6W/2 of NW/4, NE/4 of NW/4
Section 19W/2 of E/2, S/2 of SW/4, NW/4 of SW/4
Section 30NW/4 of NW/4

Township 12 North, Range 4 West
Section 1NE/4, E/2 of SE/4, NW/4 of SE/4, W/2 of SW/4, NE/4 of SW/4
Section 2SW/4 of NE/4, W/2 of SE/4, SE/4 of SW/4
Section 3W/2 of NW/4, NE/4 of NE/4, N/2 of SE/4 of NE/4, SW/4 of NE/4, S/2 of S/2 of NW/4 of NE/4, S/2 of Section
Section 4W/2 of Section, SE/4
Section 5N/2 of Section, SE/4, E/2 of SW/4
Section 8E/2 of NE/4, SE/4
Section 9E/2 of Section, SW/4
Section 10E/2 of Section, N/2 of SW/4
Section 11E/2 of Section, SW/4
Section 12W/2 of NW/4, NE/4 of NW/4, all that part of SW/4 lying East of Big Creek
Section 13All that part of the NW/4 of NW/4 lying West of Big Creek
Section 14W/2 of NW/4, N/2 of NE/4 of NW/4, SE/4 of NW/4, N/2 of NE/4, SW/4 of NE/4, W/2 of SE/4, SW/4
Section 15SW/4 of NW/4, E/2 of NW/4, NE/4, SW/4
Section 22E/2 of NW/4, NE/4
Section 23N/2 of Section, N/2 of SE/4
Section 24NW/4, S/2 of Section
Section 25NW/4 of NW/4, N/2 of NE/4
Section 26NE/4 of NE/4
Township 13 North, Range 4 West
Section 19S/2 of NE/4 of SE/4, SE/4 of SE/4
Section 20SW/4 of SE/4, SW/4
Section 28W/2 of SW/4
Section 29W/2 of Section, SW/4 of NE/4
Section 30E/2 of Section
Section 31NE/4 of SE/4
Section 32N/2 of NW/4, SE/4 of NW/4, NE/4, S/2 of Section
Section 33NW/4
Section 34S/2 of SW/4
NOTES
[1] The reservation language reads:

"There is expressly excluded from this sale, and the Vendor reserves, all mineral rights in the lands conveyed hereunder ... with the right of ingress and egress for the proper exploitation of the same. The Vendor ... shall pay the Vendee for all damage done to timber, wood or other forest products or the property of the Vendee on the lands conveyed hereunder ... in connection with operations by the Vendor ... in the course of such exploitation and shall assume the payment of, and pay any taxes levied on all minerals produced from such operations, or the increase in the value of the land, if any, caused thereby or by the equipment placed thereon in connection with such exploitation."
[2] Drilling or production operations for oil and gas have occurred on about 26 separate tracts totalling about 20,000 acres.
[3] 200 La. 917, 9 So.2d at p. 233. We note the similarity of this clause with LRS 31:11, which reads:

"The owner of land burdened by a mineral right and the owner of a mineral right must exercise their respective rights with reasonable regard for those of the other."
[4] This observation was made in a concurring opinion in 1920:

"It appears from the record that J. M. Nabors has long been a strong believer in the mineral wealth of DeSoto Parish. He had during many years preceding the transactions (in 1911) out of which this suit has arisen, devoted no little time and money in various efforts to develop it, by the organization of companies and the employment of experts. Through his instrumentality, coal had been actually mined and a carload sent to St. Louis (to the Exposition ...)" Frost-Johnson Lumber Co. v. Nabors Oil & Gas Co., et al. 149 La. 100, 88 So. 723 at 729 (1920) Parenthetical material added