ROGERS, Justice.
 

 By an act of sale dated April 12, 1934, Alex C. McKowen acquired from W. Carruth Jones and five other persons certain lands situated in the Parish of East Feliciana. The sale was made subject to a reservation by the vendors of nine-twentieths of all the mineral, oil and gas rights in and upon the lands conveyed. In the latter part of 1938, the Holloway Gravel Company, Inc., under an oral lease from McKowen, began to extract sand and gravel from the lands. These operations eventually resulted in this proceeding, instituted by the lessee, to have determined the rights of the parties under the reservation contained in the act of sale.
 

 By their answers, the defendants put at issue the question of whether the reservation of mineral, oil and gas rights in the act of sale of April 12, 1934, operated to reserve the sand and gravel lying within or under the lands conveyed.
 

 The judge of the district court resolved the issue in favor of the defendant Mc-Kowen, and from his decision W. Carruth Jones and his co-defendants have appealed.
 

 There is considerable divergence of views among the authorities as to what is ^included in a grant or reservation of
 
 *922
 
 minerals. For example, in the case of Northern Pacific Railroad Co. v. Soderberg, 188 U.S. 526, 23 S.Ct. 365, 47 L.Ed. 575, cited by appellants, the Supreme Court of the United States held that lands valuable solely or chiefly for granite quarries were mineral lands within the meaning of the exception of such,lands from the grant made to the railroad company. The Court, in its opinion, referred to and quoted from numerous decisions dealing with the term ■“mineral” as including or excluding different substances under different conditions. Among the decisions referred to was that of the Master of Rolls in the English case of Midland Railroad Co. v. Checkley, L. R. 4 Eq. 19, in which it was held that stone for road making or paving was a mineral. In announcing his decision, the Master of the Rolls observed: “Stone is, in my opinion, clearly a mineral, and in fact everything •except the mere surface which is used for agricultural purposes. Anything beyond that, which is useful for any purpose whatever, whether it is gravel, marble, fire
 
 clay,
 
 or the like, comes within the word ‘mineral’ when there is a reservation of the mines and minerals from a grant of land.” But in Brady v. Smith, 181 N.Y. 178, 73 N.E. 963, 106 Am.St.Rep. 531, 2 Ann.Cas. 636, it was held that the exception “all mines and minerals which may be found on the above piece of land, with the right of entering at any time with workmen and others to dig and carry the same away,” was not broad enough to include a bed of limestone cropping out on the surface of the premises. And in the case of Waring v. Foden, reported in 86 A.L.R. at page 969, cited by the appellee, the English Court of Appeal held that gravel was not a mineral within'the exception of a deed of all “mineral” or “mineral reservations,” especially where it constituted a large part of the soil of the land conveyed and that to give the words such meaning would be a negation of the substance of the transaction.
 

 In the Irish case of Staples v. Young, 1 Ir.Rep. 135, the Court held that if sand was to be included in the reservation of a “mineral right”' the owner would have very little to call his own, and the conclusion reached in the opinion was expressed as follows; * Xn short, I find on the evidence that the sand on the defendant’s land is ‘soil or clay,’ and is not ‘mineral’ . in its character either as ‘soil’ or as ‘clay’.” In discussing the subject in the case of United States v. Aitken, 25 Philippine 7, the Court said:
 

 “It is true that commercial gravel belongs to the mineral kingdom in that it is inorganic and that it is formed by nature alone. But there is an important distinction between it and any of the so-called minerals as recognized by the authorities. Practically speaking, all the definitions of the word ‘mineral’ agree that such a substance must always have a definite chemical composition by which it can be easily recognized, in whatever part of the earth it may be found. There can be no such uniformity in the chemical content of gravel deposits, for the reason that this depends entirely upon the character of the mineral deposits which have contributed to their formation. And upon the character, quantity, and proximity of the minerals to the gravel deposit, their susceptibility to erosion,
 
 *924
 
 the violence with which the erosion is accompanied, the duration of the eroding process, as well as various other facts, depends the size of the pebbles and the quality of the deposit as commercial gravel. There is nothing constant in the character of commercial gravel by which to identify it as a mineral, except that it consists of broken fragments of rock mingled with the finer material, such as sand and clay. Nothing definite can be said of its chemical composition as can be-said of the minerals. Commercial gravel is simply a jumbled mass of fragments of various minerals (rocks). Science, at least, cannot accept as a distinct subdivision of the mineral kingdom any substance whose character and attributes are so composite and fluctuating. It is true that beds of sandstone and limestone may possibly owe their origin in some instance to deposits of ordinary gravel. (Barringer and Adams on The Law of Mines and Mining in the United States; Enc. Brit. 11th ed., Title ‘Gravel’.) But commercial gravel has not yet reached that stage. So far as scientific classification goes, then, commercial gravel cannot be considered as a mineral.”
 

 This statement was quoted and adopted by the Supreme Court of North Carolina in Lillington Stone Co. v. Maxwell, 203 N.C. 151, 165 S.E. 351, in which it was held that digging for gravel was not mining within the provisions of a statute authorizing the refunding of a tax on gasoline used exclusively in mining.
 

 In Hendler v. Lehigh Valley Railroad Co., 209 Pa. 256, 58 A. 486, 103 Am.St.Rep. 1005, it was held that sand in its broadest sense, as belonging to one of- the three great divisions of matter, animal, vegetable, and mineral, is a mineral. In its more restricted scientific sense, however, it may or may not be a mineral according to its composition. A deposit of pure white quartz sand, suitable for the making of glass and other special use, would be within a reservation of “coal and other minerals,” but common mixed sand, merely valuable as material for grading, would not be.
 

 For the purposes of our decision it is not necessary that we comment upon all the cases cited by the parties. It suffices to say (hat while there appear to be irreconcilable differences among the authorities as to the principle that determines the question of what is granted and what is excepted in deeds and other contracts, there are certain fundamental principles which may be gathered from their various pronouncements. Thus in Northern Pacific Railroad Co. v. Soderberg, [188 U.S. 526, 23 S.Ct. 367, 47 L.Ed. 575], cited and relied on by appellants, the Court said: “The word ‘mineral’ is used in so many senses, dependent upon the context, that the ordinary definitions of the dictionary throw but little light upon its signification in a given case.” In that case the Court refused to attempt an exact definition of the term “mineral lands” as used in the land laws of the United States, and it apparently based its decision on the proposition that the term as used in federal land grants included not merely metalliferous lands, but all such lands as are chiefly valuable for
 
 *926
 
 their deposits of a mineral character, which are useful in the arts or valuable for purposes of manufacture.
 

 In 18 R.C.L., Mines and Minerals, sec. 3, p. 1094, in discussing the interpretation of grants of minerals, the author says: “The most reasonable rule is that each case must be decided upon the language of the grant or reservation, the surrounding circumstances and the intention of the grantor if it can be ascertained.” The rule as thus announced is supported by an abundance of authority. We mention a few. McKinney’s Heirs v. Central Kentucky Natural Gas Co., 134 Ky. 239, 120 S.W. 314, 20 Ann.Cas. 934; Brady v. Smith, 181 N.Y. 178, 79 N.E. 963, 106 Am.St.Rep. 531, 2 Ann.Cas. 636; Sult v. A. Hochstetter Oil Co., 63 W.Va. 317-323, 61 S.E. 307; Rock House Fork Land Co. v. Raleigh Brick & Tile Co., 83 W.Va. 20, 97 S.E. 684, 17 A.L.R. 144. In the latter case, as shown by paragraph 1 of the syllabus, it was held that: “The term ‘mineral’ is not a definite one, capable of a definition of universal application, but is susceptible of limitation according to the intention of the parties using it, and in determining its meaning regard must be had, not only to the language of the deed' in which it occurs, but also to the relative position of the parties interested, and to the substance of the transaction which the deed embodies.” See, to the same effect, the case of Glasgow v. Farie, 17 Eng. Rul. Cas. 485, where it was said that the word “mineral” is not a definite term and is susceptible of limitations and extensions according to the intention with which it is used.
 

 In Kinder v. LaSalle County Carbon Coal Co., 310 Ill. 126, 141 N.E. 537, 539, it was held that while sand, and even soil, is embraced in the technical definition of minerals, yet what is embraced in a grant or reservation of the underlying “minerals” must in each case be decided on the language, the surrounding circumstances, and the intention of the parties if ascertainable. In that case the granting clause of the deed conveyed the underlying coal, together with the right to mine the same, followed by a quitclaim clause in favor of the grantee to the oil and minerals of every description underlying the property. The Court held that trnder the language of the deed, the surrounding circumstances and the intention of the parties, the “grant of ‘minerals of every description’ ” did not include sand, gravel, and limestone.
 

 We do not find anything in the statutes or the decisions of the courts of this State defining the status of sand and gravel in mineral right reservations. Indirectly the legislature has appeared to class sand and gravel as natural resources as distinguished from minerals such as oil, gas, sulphur, lignite, etc. Beginning with the adoption of Act 196 of 1910, the meaning of the word “mineral” has apparently been restricted by various legislative acts. Act 209 of 1912 and its amendments; Act 258 of 1912; Act 12 of the Extra Session of 1912; Act 296 of 1914; Act 31 of 1920; Act 140 of 1922 and its
 
 *928
 
 amendments; Act 301 of 1926; Act 145 of 1940.
 

 Act 258 of 1912 empowers the Governor to lease any vacant or unappropriated public lands belonging to the State for the development and production of oil, gas, coal, sulphur, lignite and other minerals. By Act 127 of 1912, the Legislature created the Conservation Commission as a Department of the State for the purpose of the protection, management, and conservation of the natural, mineral, and forestry resources of the state with power to adopt rules and regulations for the comprehensive control of such resources.
 

 In the case of Irion v. Lyons, 164 La. 306, 113 So. 857, 858, this Court declared: “Sand, gravel, and shells owned by the state clearly fall under the designation ‘natural resources’ and passed under the jurisdiction and control of the state department of conservation without express mention to that effect.” The Court did not say that sand .and gravel were “mineral resources” of the state, but it did say that sand and gravel, like shells, were “natural resources” of the State.
 

 Counsel for appellants make much of the decision of this Court in Logan v. State Gravel Co., 158 La. 105, 103 So. 526. They insist that since the decision of that case “it should no longer be considered a matter of argument that sand and gravel are looked upon by law to be, as they are in fact, minerals.” We are at a loss to understand counsel’s insistence upon this point. We find nothing in the decision to support their statement. The opinion does not contain any language that can be construed as holding that sand and gravel are minerals in any sense, legal or otherwise. The only question presented for decision in the case, as appears from the opinion, was whether the contract- under review was a lease or a sale. The Court, after declaring that there was nothing in the laws of this State forbidding the leasing of lands and quarries or of lands for mining and quarrying purposes, held that the contract was one of lease — -not a mineral lease, as counsel for appellant contends, but an ordinary lease of an immovable by virtue of which the lessor was entitled to the lessor’s privilege on the property of the lessee on the premises to secure the unpaid rent.
 

 We do not find it necessary to determine in this case whether or not gravel and sand are minerals. As we view it, the primary question for decision is whether, if it be conceded that sand and gravel are minerals, it was the intention of the parties that they should be excepted from the sale. The appellee pleads, and here insists, that it was not within the contemplation, and was not the intention, of the parties that sand and gravel were included in the reservation.
 

 It is elementary that in the execution of deeds and like instruments the intention of the parties must be gathered from an inspection of the instruments without the aid of extrinsic evidence, but if the instrument is so ambiguous as to leave the mind in doubt as to what the parties intended, extrinsic evidence may be resorted to as an aid in its construction. Hudson & Collins v. McGuire, 188 Ky. 712, 223 S.W. 1101, 17 A.L.R. 148.
 

 
 *930
 
 The rule that the intent of the parties governs the scope' of the contract is set forth in Article 1959 of the Civil Code in these words: “However general he the terms in which a contract is couched, it extends only to the things concerning which it appears that the parties intended to contract.”
 

 We think it evident, when the instrument as a whole is construed, that it was not the intention of the parties that the reservation embodied therein included the right to exploit the land for sand and gravel.
 

 It may be observed that sand and gravel are not specifically mentioned in the reservation. The words used to express the exception are “mineral, oil and gas rights;” that is to say, mineral rights, oil rights and gas rights. The words “mineral rights” necessarily must be read in connection with the things subsequently .named, to-wit, “oil rights” and “gas rights” and should be confined to things of that nature. The reservation was not of the minerals themselves, but merely of the right to exploit the minerals.
 

 In the case of Huie Hodge Lumber Co. v. Railroad Lands Co., 151 La. 197, 91 So. 676, 677, the reservation under review was “the exclusive right to the iron, coal, and other minerals.” The Court, in applying the rule ejusdem generis, held that oil and gas was not included in the all embracing phrase “and other minerals,” for the reason that the reservation itself indicated that only solids, such as coal and iron, were in the contemplation of the parties. The Court followed the general rule that all such reservations must be construed according to the intention of the parties, and in doing this the surrounding circumstances and conditions must be considered, together with the terms and language used. Conversely, in this case the reservation indicates that only minerals likened unto oil and gas, and not to solids, such as sand and gravel, were in the contemplation of the parties.
 

 The author of the present reservation used the words “oil and gas rights” immediately following, and separated only by a comma, from the word “mineral”. Obviously, he used the terms “oil and gas rights” for some purpose, and what could he have intended if his purpose was not to limit or restrict the application of the more comprehensive term ? Oil and gas are minerals and were included in the more general term, and therefore, logically speaking, he could have employed the terms “oil and gas” for no other purpose than to define more particularly the minerals reserved. The remainder of the clause conferring the ancillary right to use the surface of the land for the purpose of exploring for the minerals and for removing such as might be found by all such means and equipment as are usual and necessary, is peculiarly applicable to exploiting and operating lands for minerals of a migatory character such as oil and gas, and not for the mining of minerals in place. The reservation has no provisions for mining and excavating sand or gravel, or for their care and disposition. Nothing is said about the use of dredges, boilers, pumps, screening plants, and other instrumentalities ordina
 
 *932
 
 rily used in digging and caring for sand and gravel. If sand and gravel were in the minds of the parties at the execution of the sale and reservation, we would expect to find expressions or terms referring specifically to the rights and privileges necessary to the discovery and development of such materials, but there is not a word in the reservation specifically giving the parties any such right or privilege. Furthermore, the concluding language of the present reservation does not warrant a construction of the language “mineral, oil and gas rights” so as to include sand and gravel rights. The concluding words of the reservation are that “the vendors, their heirs, executors, administrators and assigns, shall always exercise and have due regard for the rights of the purchaser, his heirs and assigns, as owner of the land.”
 

 McKowen is a farmer, and he testified that he purchased the property for grazing and agricultural purposes. As any operation on the. land for sand or gravel would result in the utter destruction of. its surface, it is not difficult to reach the conclusion that such operations would greatly impair, if not wholly destroy, McKowen’s rights which it was the purpose of the clause to protect. It would not be reasonable to construe the reservation of “mineral, oil and gas rights” so as to embrace the right to exploit minerals which could not be removed from the land without destroying its surface for agricultural and grazing purposes. We do not think it can be seriously contended that it was in the contemplation of McKowen that he might at any time be deprived of the use of the land for the purposes for which he had purchased it by the mining of sand and gravel thereon largely for the benefit of his vendors.
 

 The reservation was prepared by W. Carruth Jones, acting for himself and his co-owners, and if there is obscurity in the clause so far as the use of the word “mineral” is concerned, a construction most favorable to McKowen, the other party to the contract, must be adopted. Civ.Code, art. 1958.
 

 Our construction of the present reservation is amply supported by the extrinsic evidence in the record. The evidence shows that Thompson’s Creek forms the division line between the parishes of East Feliciana and West Feliciana. The creek forms one of the boundaries of the land purchased by McKowen from Jones and his co-owners in 1934. While sand and gravel operations have been carried on along Thompson’s Creek for many years, there ne'ver had been any operations in the vicinity of the Jones’ property prior to the year 1934. All the prior gravel operations had been conducted within the banks of the creek several miles north of and moving northward away from the property.
 

 In the year 1938, McKowen sold to the Holloway Gravel Company at so much per carload the sand and gravel from the land he purchased from W. Carruth Jones and his co-owners and in the same year the Holloway Gravel Company began operation within the bed of Thompson’s Creek. After conducting its operations for some months, the gravel company left the work. After an absence of about a year
 
 *934
 
 the Company returned and resumed operations, at which time it discovered large sand and gravel deposits in the high lands adjoining the creek.
 

 The testimony shows that members of the Jones family had noticed the existence of gravel in Thompson’s Creek, but there is no evidence that they had any information that would have prompted them to have included sand and gravel in the reservation. During the negotiations conducted by McKowen and Jones looking to the sale and purchase of the property, the parties only discussed the reservation of oil, gas and minerals. They never discussed the reservation of sand and gravel. In view of the specific conversations between the parties relative to the reservation of oil and gas rights, it would seem that Jones, who was insisting upon the mineral reservation, would have let it be known to McKowen that it was his intention to include sand and gravel if such were the fact. It would have been a very simple matter, granting that all the parties agreed to the reservation of sand and gravel, to have used those words in addition to the words “mineral, oil and gas rights.”
 

 To adopt the interpretation insisted upon by counsel for the appellants would impose a most onerous burden upon the owner of the land. Under the interpretation, appellants would have the right to exploit every foot of the property for sand and gravel with the attendant, destruction exhibited by a number of photographs which were offered in evidence on the trial of the case.
 

 At the time the land was purchased by McKowen, there was considerable oil excitement in that section of the State and many oil and gas leases were granted on lands in the vicinity, while on the other hand, gravel operations were tending away rather than towards the property. It is clear from the testimony that McKowen did not consider the property as having any valu'e whatever" for its gravel and sand. He attempted to sell it for an insignificant sum, as compared with its intrinsic value from the point of view of sand and gravel, to Joseph T. Howell, who had married a niece of Jones. The testimony also shows that according to the usage of the trade, it is not contemplated that sand and gravel are included in a mineral reservation. Jones never at any time made a personal demand on McKowen for a share in the proceeds derived from the sale of the sand and gravel by McKowen to the Éblloway Gravel Company. The entire proceeds were paid to McKowen by the gravel company through May, 1940, when Jones, acting for himself and his co-owners, advised the attorney of the gravel company that they were claiming an interest in the proceeds under the reservation embodied in the sale to McKowen. It was as a result of this claim asserted by the appellants against the Holloway Gravel Company that the company deposited forty-five per cent of the price of the sand and gravel for a specific period in the registry of the district court and cited the appellants and the appellee to appear and assert their claims in the amount deposited.
 

 The trial judge reached the conclusion that if any of the parties to the transaction had considered that the land had potential
 
 *936
 
 value for sand and grayel deposits', they would have discussed that matter in the negotiations and specifically mentioned sand and gravel in the reservation. We find nothing in our examination of the record that warrants us in taking issue with his conclusion.
 

 For the reasons assigned, the judgment appealed from is affirmed.