331 So.2d 878 (1976)
RIVER ROUGE MINERALS, INC., Plaintiff-Appellee,
v.
ENERGY RESOURCES OF MINNESOTA et al., Defendants-Appellants, and
Wortley F. Scheller and Sara Cale Samuels, Defendants-Appellees.
No. 12879.
Court of Appeal of Louisiana, Second Circuit.
April 19, 1976.
Rehearing Denied May 24, 1976.
*879 Gamble & Sledge, by Jack R. Gamble, Jr., Mansfield, Gremillion & Williams, Baton Rouge, by L. Todd Gremillion, Houston, Tex., and Brian L. Williams, Baton Rouge, Vance R. Andrus, Lafayette, and Paul B. Saltzman, Minneapolis, Minn., for defendants-appellants.
Wilkinson, Carmody & Peatross, by Arthur R. Carmody, Jr., Shreveport, Colvin, Hunter, Brown & Plummer by Charles C. Hunter and D. Scott Brown, Mansfield, for appellees.
Before BOLIN, MARVIN and SMITH, JJ.
En Banc. Rehearing Denied May 24, 1976.
SMITH, Judge.
In this declaratory action we determine whether an oil, gas and mineral lease[1] of common usage in Louisiana grants to a lessee thereunder the privilege of strip mining lignite coal. The lower court decided the oil, gas and mineral lease does not grant strip mining privileges. Defendants claiming under the lease appeal. We affirm.
In 1971, the defendant landowner executed three of the Bath form leases on certain properties to the defendant David E. Burk, Sr. Various rights and royalty interests under these leases were later assigned to other defendants.
In 1973, the landowner leased to plaintiff, simply called "River Rouge", on a lease form entitled "Coal and Lignite Lease", the same properties, expressly providing for strip mining of the resource. The 1971 oil, gas and mineral leases were recorded on the public records before the execution and recordation of the coal and lignite lease to River Rouge. River Rouge brought the declaratory judgment action against the landowner and the lessees and assigns under the 1971 oil, gas and mineral leases, seeking a declaration as to whether it had exclusive rights and privileges of strip mining coal under the 1973 coal lease, as against defendants claiming under the prior executed and recorded oil, gas and mineral leases. The lower court declared River Rouge had such exclusive rights and it is this declaration that we affirm.
There was expert testimony on similarities and differences between lignite coal and oil and gas. All three are fuels of considerable value and contain approximately 75 per cent hydrocarbon. As a raw material, each may be converted into many identical products. The essential distinction between solid coal, liquid oil, and natural gas is in the method of extraction from the ground.
The method of exploring for and producing oil and gas is well known in Louisiana. Production is obtained by drilling into the subsurface to reach a porous sand or cavity containing oil and/or gas. The resource is brought to the surface by its own pressure or by artificial pressure and is transmitted by pipeline to accessible reservoirs or other marketing points. The exploration for and production of oil and gas are relatively clean operations and occur without great disturbance of the surface owner's enjoyment of the property, whether in rural or urban areas.
According to opinion testimony lignite coal cannot be produced by the methods used in the production of oil and gas. *880 Lignite coal was discovered in DeSoto Parish many years ago. Only in recent years has it become economically feasible to produce and market this resource in Louisiana.
Lignite coal is found in veins of varying thickness below the surface at depths of 25 to 200 feet. The surface depth above the vein of coal, called overburden, must be entirely removed by powerful machines before extracting the coal for market. This process of extraction, called strip mining, completely eliminates the surface owner's enjoyment of the portion of the property being mined. The Bath form lease expressly contemplates the surface owner's continued enjoyment of the property during drilling and production. The word "drilling" appears repeatedly in the lease as does, to a somewhat lesser degree, the word "well". These words are used throughout the fourteen paragraphs of the lease to set forth the rights, obligations, and conditions imposed upon each party. The word "mine" is used only once in the lease and there was testimony that "mining" is synonymous with the process of extracting oil and gas from the earth.
The Bath form lease as a whole, is inconsistent with the operations necessary in strip mining lignite. It provides for ". . . laying pipe lines, building tanks, power stations, telephone lines, and other structures thereon . . ." These activities are consistent with oil and gas operations but not with strip mining operations.
Paragraph three of the lease provides for royalty payments. Three subparts deal with liquid and gaseous hydrocarbons. Paragraph three (d) is the only provision dealing with "other minerals". It provides that the royalty for "all other minerals" is to be "1/8 either in kind or value at the well or mine, at lessee's election, except that on sulphur the royalty shall be 50¢ per long ton." Sulphur is extracted from the ground by the Frasch process, a drilling and extraction process which brings sulphur to the surface in liquid form. This process is much more similar to oil and gas production than strip mining of the solid lignite.
Expert testimony reveals that the conventional production royalty paid for lignite is generally 20 cents per short ton or 5 per cent as compared with the 12.5 per cent royalty provided in the instant case. Thus a holding that the Bath form oil, gas and mineral lease grants rights to lignite coal production would delay commercial development of lignite in Louisiana because of the reduced profit caused by a royalty 2½ times that of the ordinary strip mining lease. It is the policy of this state to maintain property in commerce. Gueno v. Medlenka, 238 La. 1081, 117 So.2d 817 (1960).
Paragraph four provides for termination of the lease after one year or, alternatively, for maintaining it for the primary term by the payment of annual delay rentals if "operations for drilling are not commenced on said land on or before one year from this date." The lease may be maintained during the primary term by production or by drilling or by paying delay rentals if no drilling operations have been commenced.
Paragraph five refers only to operations consistent with drilling, not strip mining. For example, that paragraph provides that if "at the expiration of the primary term oil, gas, sulphur, or other mineral is not being produced on said land but lessee is engaged in drilling or reworking operations thereon, the lease shall remain in force so long as operations are prosecuted with no cessation of more than thirty (30) consecutive days . . ." (emphasis supplied).
Paragraph six refers to "pooling" or "unitization" which has no connection with or applicability to lignite production. Paragraph seven requires the lessee, if requested to do so by the lessor, to "bury all pipe lines below ordinary plow depth" and *881 that "no well shall be drilled within two hundred feet of any residence or barn now on said land without lessor's consent." Strip mining is inconsistent with these provisions. Paragraph nine deals with retention by a lessee of an acreage around each "well" in the event the lease is cancelled or otherwise terminates.
A typewritten paragraph adds further support to our analysis of the whole instrument. It provides:
"Notwithstanding any language to the contrary, Lessee agrees to compensate Lessor for any damage done to the premises by drilling operations by Lessee or his assigns on said leased premises. And also Lessee agrees that after the abandonment of any well that the premises will be returned to the same condition as they were previous to the drilling operations."
This supports our conclusion that the lessor intended to continue his use of the property during exploration and production.
The sense resulting from the entire act must be considered in determining whether coal is included in the term "all other minerals", La.C.C. art. 1955; Edwards v. Terminix, 292 So.2d 851 (La.App.2d Cir. 1974). We conclude the Bath form lease does not encompass lignite coal in the phrase "all other minerals."
This conclusion is consistent with the Supreme Court's interpretation of the phrase "other minerals" in a reservation of "the exclusive right to the iron, coal, and other minerals." In Huie Hodge Lumber Co. v. Railroad Lands Co., 151 La. 197, 91 So. 676 (1922) the court concluded that such a reservation in a document executed when the existence of oil and gas was unknown, and making no mention of derricks, pipe lines, tanks, the use of water for drilling, or the removal of machinery used in drilling or operating oil or gas wells, did not include oil and gas. While the existence of the coal deposits may have been known when the instant lease was executed, no one then considered it economically feasible to extract it.
There is no reference in the Bath form lease to rights to the use of so much of the surface of the land as may be necessary for pits, shafts, platforms, drains, railroads, switches, side tracks, etc., to facilitate strip mining and removal of solid minerals. The exclusive reference to such particulars indicated to the court in Huie Hodge, supra, that oil and gas were not contemplated there. The absence of such reference and the attention here to provisions for pipelines, pooling and unitization, offset wells, and drilling, in the Bath form lease indicate that the strip mining of lignite coal was not contemplated.
The Supreme Court in Huie Hodge, supra, also noted:
"Besides, the rule ejusdem generis requires that the words `other minerals' following the specific terms coal and iron be construed as intending or including other minerals of a character similar to coal and iron, such as solids or minerals in place, requiring mining, for their removal instead of drilling, etc." id at 677.
We conclude the distinction was made there on the basis of the physical properties of the mineralgas or liquid as opposed to solidrather than elemental composition.
The Supreme Court addressed the problem 20 years later in Holloway Gravel Co., Inc. v. McKowen, 200 La. 917, 9 So.2d 228 (1942). Using the same principles of interpretation employed in Huie Hodge, supra, the court held the phrase ". . . all the mineral, oil and gas rights" was limited to minerals of the character of oil and gas and did not include sand and gravel. The court also noted that the digging of gravel, strip mining to a lesser degree than extracting lignite coal, would be incompatible with the agricultural use being made of the property.
*882 The authority and reasoning of those two cases are applicable here. We find no real distinction between the phrase "all other minerals" and the phrases "and other minerals" or "all the mineral. . . rights." We hold the grant in the instant case was the right to explore for and produce minerals of the same physical properties as oil and gas, i.e. those minerals that are produced in liquid or gaseous form by drilling wells into the subsurface. Lignite coal is not included in the grant.
For the foregoing reasons, the judgment of the lower court is affirmed at appellants' cost.
AFFIRMED.
NOTES
[1] Bath Form La.Spec. 14BRI-2811-631.