404 So.2d 428 (1981)
The CONTINENTAL GROUP, INC.
v.
J. L. ALLISON, Jr., et al.
No. 67188.
Supreme Court of Louisiana.
January 26, 1981.
On Rehearing June 22, 1981.
Concurring Opinion On Rehearing October 8, 1981.
Rehearing Denied October 9, 1981.
Blanchard, Walker, O'Quin & Roberts, Robert Roberts, III, Joseph W. Milner, Randall S. Davidson, Shreveport, Wright, *429 James, Hogg & Bleich, Howard W. Wright, Jr., Ruston, Colvin, Hunter, Brown, Plummer & Means, D. Scott Brown, Mansfield, for plaintiff-applicant.
Wiener, Weiss, Madison & Howell, John M. Madison, Jr., James F. Howell, James R. Madison, Wilkinson, Carmody & Peatross, W. Scott Wilkinson, Shreveport, for defendants-respondents.
Daniel T. Murchison, Watson, Murchison, Crews, Arthur & Corkern, Natchitoches, Frank W. Voelker, Jr., Voelker, Ragland, Brackin & Crigler, Lake Providence, Wedon T. Smith, Smith, Taliaferro, Seibert, Boothe & Purvis, Jonesville, Gene W. Lafitte, Joe B. Norman, Charles C. Gremillion, Liskow & Lewis, New Orleans, William D. Brown, Brown, Wicker, Lee & Barnes, Monroe, Louis D. Curet, D'Amico & Curet, Baton Rouge, Thomas A. Self, Self & Burkett, Many, T. Lynn Geneux, Herold & Geneux, Shreveport, George H. Meadors, W. F. M. Meadors, Meadors & Meadors, Homer, R. H. Madden, III, L. D. Napper, III, Napper & Madden, William S. Carter, Jr., Robert G. Dawkins, Dawkins, Coyle & Carter, Ruston, Raoul P. Sere, Lancaster & Sere, Metaire, Malcolm S. Murchison, Ray A. Barlow, Hargrove, Guyton, Ramey & Barlow, Shreveport, James G. Bethard, Henry Bethard, III, Bethard & Davis, Coushatta, Richard E. Gerard, Lake Charles, Richard B. Sadler, Jr., Ledoux R. Provosty, Jr., Provosty, Sadler & Delaunay, Alexandria, Edgar H. Lancaster, Jr., Lancaster, Baxter & Seale, Tallulah, Howard Coghlan, Kenley, Boyland, Coghlan & Erskine, Longview, Tex., Edward G. Randolph, Jr., Alexandria, for amicus curiae.
CALOGERO, Justice.
In the year 1956 after two years of negotiations, Mansfield Hardwood Lumber Company sold for approximately $90.00 per acre, 92,000 acres of timberland in seven parishes in North Louisiana to Robert Gair Co., Inc. predecessors of the Continental Group, Inc. In that sale there was specifically reserved to vendor "all mineral rights" and there was further included a damage clause providing for restitution to the vendee for impairment of his interests incurred in the exercise of such mineral servitude.[1]
An additional 1100 acres of timberland were not sold in 1956 because of title deficiencies, the conveyance to Continental being accomplished later, in 1963, following curative title work. That sale also excluded, or reserved to vendors, "all mineral rights" with a similar damage clause operating in favor of the vendee.
At the time of the sale some 20,000 acres were subject to oil and gas leases. No other minerals were then subject to leases or in production. There were known sand and gravel deposits on some of the acreage, and while lignite, a type of coal,[2] was known to exist on certain acreage, production apparently was not then economically feasible.
Due to worldwide trends in the decade of the 1970's prompted in part by the advent of the OPEC oil cartel, the relatively high cost of extraction of lignite was overcome by the value of that substance in the energy marketplace. Profit from the strip mining of lignite had become feasible.
In 1977 plaintiff Continental sued J. L. Allison, Jr. and several others, former corporate shareholders in Mansfield, and assignees *430 of Mansfield's reserved mineral rights, seeking a declaratory judgment that the servitude created by reservations in the sale included only the right to explore for and exploit oil, gas and kindred minerals and not the right to explore for or strip mine for solid minerals such as lignite.
After exhaustive discovery and protracted trial, there was judgment in the district court in favor of plaintiff Continental that the parties to the 1956 sale had not contemplated that lignite coal would be included in the vendor's reservation of "all mineral rights". The trial judge commented that in his opinion the case was close enough to have been decided either way.
The Court of Appeal reversed this decision holding that under the peculiar circumstances of the case, Gair (Continental) and Mansfield (defendants' predecessor) had in fact intended to include in the reservation the right to explore for various substances designated as minerals, including lignite coal.
We granted writs upon the application of Continental which contests the Court of Appeal decision. They complain of the "far reaching consequences" of the decision below.
Two issues are here presented: whether the reservation of "all mineral rights" included the right to explore for lignite coal; and if so, whether the mineral servitude as to lignite had prescribed for ten years non-use on the lands involved in this litigation (some 20,000 acres) notwithstanding production of oil and gas (the latter question posed differently is, does interruption of prescription of a mineral servitude apply to all types of minerals covered by the acts creating the servitude and to all modes of the servitude's use?).
For the reasons so ably stated by the Court of Appeal and for those which follow, we hold that the mineral servitude here created included the right to explore for lignite and that oil and gas production on the 20,000 acres interrupted prescription as to the lignite mineral servitude.
Mansfield specifically and broadly reserved "all mineral rights". Plaintiffs contend that Mansfield and Gair, Continental's predecessor, intended to restrict the reservation to oil and gas. The facts we find, and as found by the Court of Appeal, do not support plaintiffs' position, but just the reverse.
The Court of Appeal exhaustively treats this first factual issue of the contractual intention of the parties; we choose simply to adopt that reasoning. As discussed in the court below, the circumstances preceding and subsequent to the act of sale are indicative of what in fact transpired in the agreement between Mansfield and Gair.
The 1956 act of sale was perfected after two years of extensive negotiations between the parties and took place one year subsequent to an agreement to sell. In negotiating for the sale of these lands, the vendor offered to convey to vendee all of the minerals, or the right to extract all minerals for an additional ten dollars per acre. The vendee declined to accept this offer, and the trial court so found. This decision not to purchase all the minerals is among the strongest indications of the intention of the parties concerning what was reserved and what was intended to be reserved when the parties employed in the contract of sale the language "[t]here is expressly excluded from this sale, and the vendor reserves, all mineral rights in the lands conveyed hereunder ..." Gair's unwillingness to purchase the minerals does not demonstrate, as the trial court decided, an indifference to the ownership of the mineral rights. Rather, it suggests a positive decision on Gair's part to refrain from purchasing the rights to minerals in which they, by their own admission, had no interest whatever.[3] And it is the opinion of this Court, just as it was suggested to Gair by Mansfield at the time Gair chose not to deal for the minerals, that Gair rightfully be *431 bound to the consequences of their decision and that they be held to have intended to surrender claim to those rights.
An early draft of the agreement to sell prepared by plaintiff provided that the sale would be "... exclusive of mineral rights..." and that "... there shall be excepted and reserved to the seller in each deed ... all mineral rights." At a point later in the negotiations when Gair's New Orleans counsel attempted to restrict the term "all mineral rights" to exclude the right to extract earth, sand, and gravel, such attempt was met by Mansfield protest and, as a result, the reservation remained unrestricted. While the attempt to restrict the mineral reservation to exclude sand and gravel admittedly says nothing specifically about Gair's intentions concerning other minerals, such as lignite, Mansfield's refusal to limit the servitude indicates that the negotiators for that company were determined to retain, as defendant suggests, the rights to all minerals.
Apparently in response to the vendor's refusal to make any exceptions to the broad reservation of "all mineral rights", there was included in the contract of sale the damage clause set forth at footnote one of this opinion. That damage clause is sufficiently broad to encompass all damages to be occasioned by Continental including not only damage to standing timber but also damage to the vendee's timber growing operations.
We focus here on the intention of the parties because that is ultimately the significant question. It deserves noting, however, that the language employed in the mineral reservation is not ambiguous. The words "all mineral rights" clearly encompass solid minerals such as lignite as well as fugacious minerals such as oil and gas. There is a bit of convolution in plaintiff's position that the words of the reservation properly interpreted excludes solid minerals and that it is therefore incumbent on defendants to prove that the specific intention of the parties was to include the reservation of lignite and/or any other solid minerals.
Plaintiff's approach is not wholly without support but it is not, in our view of this case, correct.
In the more usual mineral servitude grant involving landowner and mineral purchaser, broad language has understandably and properly been restricted by the courts. Consequently there has arisen the principle that the proper interpretation is that which least restricts ownership of the land conveyed (McDuffy v. Weil, 240 La. 758, 125 So.2d 154 (1964)) and the rule of ejusdem generis.[4]
The latter principle has been applied to interpret "iron, coal and other minerals" in one of two deeds (the other having used the words "iron, ore, coal, fireclay, kaolin, and marl") as not including oil and gas (Huie Hodge Lumber Co. v. Railroad Lands Co., 151 La. 197, 91 So. 676 (La.1922)); and to interpret "all the mineral, oil and gas rights" in lands conveyed to a farmer for grazing and agricultural purposes, as not reserving the right to exploit the land for sand and gravel. Holloway Gravel Co. v. McKowen, 200 La. 917, 9 So.2d 228 (1942). And in a recent case involving lignite coal, this Court refused writs after the Second Circuit determined that parties who had employed the commonly used Bath form oil, gas and mineral lease had effected a grant to explore for and produce minerals of the same physical properties as oil and gas, and that lignite coal was not included in that grant. River Rouge Minerals, Inc. v. Energy Resources of Minnesota, 331 So.2d 878 (La.App.2d Cir. 1976).
The case before us, however, on its particular and unusual facts is clearly distinguishable from the foregoing cases. For one *432 thing, there were here two large timber companies confecting a not so usual sale of 90,000 acres of timber land for a price (geared to timber value) in excess of six million dollars. They specifically negotiated, incident to the timberland sale, concerning "all minerals" and "all mineral rights". The language they chose to employ in the reservation was "all mineral rights" a term unaccompanied by other terms, unlike the cases cited hereinabove.
We therefore determine that the parties in this case intended what the words chosen clearly express, that the vendor reserved "all mineral rights".
We do not intend, nor envision, this decision as affecting untold mineral leases outstanding in this state. We have simply decided this case on its particular facts.
One of plaintiff's major arguments is that the lignite strip mining process so impairs surface rights that a timber company like Gair would not have purchased these lands had they realized that vendors were reserving the right to strip mine lignite. Thus, it is argued, the parties must have intended to exclude lignite from the reservation, or alternatively, there was no meeting of the minds.[5]
With respect to the degree of impairment of surface rights, the assessment by the Court of Appeal is supported by the record.[6] With respect to the contention that Gair would not have purchased the lands had they realized that vendors were reserving the right to strip mine lignite, that, of course is conjectural. The simple fact of the matter, however, is that Gair permitted, or agreed to, vendors' reserving all mineral rights. They are to be held to their contract.
Nor are we impressed with plaintiff's contention that vendors, while using unrestricted mineral reservation language, did not specifically contemplate or intend the reservation of the right to strip mine lignite; that they cannot be regarded as having contemplated the inclusion of a mineral substance having in 1956 no foreseeable economic value in the absence of an express intention to the contrary. The Court of Appeal response to this contention was:
The very word explorelong used with exploit in explaining the nature of the mineral servitude, whether oil and gas or solid mineralsimplies a venture into the unknown or uncertain. This is in the nature of a `hope' which may be sold or reserved. C.C. Art. 2451. The economics of mineral exploration and exploitation have always been uncertain and the fact that a particular mineral has no foreseeable economic value at the time a mineral reservation is made is but one factor to be weighed with other factors in determining what the parties intended. It was a factor in Holloway Gravel. It is a factor here, but to a much lesser extent because these parties bargained and negotiated about the scope of the term all mineral rights and eventually agreed that the term would not be limited, even as to gravel, and that a damage provision would be added to recompense, wholly or in part, the landowner for whatever it might suffer by reason of the exercise of the right of the servitude owner to all minerals. The Continental Group, Inc. v. J. L. Allison, Jr., et al., 379 So.2d 1117 at 1129 (La.App. 2d Cir. 1979).
The Court of Appeal was correct. The reservation of "all mineral rights" in this *433 case included the right to explore for and exploit lignite coal, a solid mineral. And the Court of Appeal was likewise correct in remanding to allow the trial court and the parties to determine how and to what extent a reasonable exercise of the projected servitude by the strip mining of lignite by the defendants may be permitted by law, citing Delahoussaye v. Landry, 3 La.Ann. 549 (La.1948), the Louisiana Mineral Code, and La.Civ. Code arts. 772-779.
As already suggested hereinabove, the right in vendor's assignees to strip mine for lignite coal is relevant in this litigation only to approximately 20,000 of the 90,000 acres of land conveyed, for it was only as to the 20,000 acres that defendants have preserved any mineral interest by their exploration for oil and gas. The mineral servitude as to the remaining acreage has prescribed through non-use, the parties concede.
With respect, however, to the 20,000 acres, plaintiff relators take the position that even if the mineral reservation is found to include the right to explore for lignite coal, that right has prescribed because production of oil and gas did not interrupt the ten year non-use prescription as relates to lignite.
The present mineral code answers this precise question favorably to defendants.
Prescription of nonuse is interrupted by the production of any mineral covered by the act creating the servitude. The interruption occurs on the date on which actual production begins and prescription commences anew from the date of cessation of actual production. R.S. 31:36.
An interruption of prescription applies to all types of minerals covered by the act creating the servitude and to all modes of its use. R.S. 31:40.
This provision of the mineral code, however, was not applicable until 1975 and this legal issue pre-1975 was not clearly resolved in the jurisprudence.
The Court of Appeal, therefore, relied on GMB Corp. v. Cox, 340 So.2d 648, (La. App.2d Cir. 1976) which held that the mineral code is to be retroactively applied where the particular issue has not been clearly resolved to the contrary by litigation. And in this instance the issue had not been so resolved.
Plaintiff asserts that the Court of Appeal should have but did not determine the applicable law pre-mineral code; that they, plaintiffs, are entitled to such resolution now, for, given their sought for interpretation, and having such interpretation (prescription) apply ten years following reservation of the servitude, they claim a property right which should not be divested by retroactive application of the mineral code.
Without conceding the procedural point, that is, that the Code of Appeal's reliance on Article 214 of the Mineral Code is inappropriate, but rather pretermitting that issue, we nonetheless hold that oil and gas production in this case did interrupt prescription as to the digging of solid minerals, for the reason that such is the preferred interpretation of the law as it was before passage of the Mineral Code.
Continental, in support of its contention that oil and gas production alone did not interrupt prescription of vendor's right to strip mine for lignite, relies upon La.Civ. Code arts. 796-799[7] which generally relate *434 to prescription of a mode of use of a servitude. Article 796 provides that the mode of servitude, which is defined as the manner of using it, is subject to prescription just as is the servitude itself, and in the same manner. And Article 798 provides that if the owner has enjoyed a right less extensive than is given him by his title, the servitude, whatever be its nature, is reduced to that which is preserved by possession during the time necessary to establish prescription.
Thus, plaintiff contends that while the drilling for and production of oil and gas has interrupted prescription with respect to the servitude as relates to oil and gas, the failure to strip mine for lignite has caused a loss by prescription of that mode of use of the servitude, that is, the extraction of lignite.
Our answer to that argument is this. The mineral servitude here at issue is a discontinuous servitude which is unlimited by title as to its exercise, whereas articles 796-799 are applicable only to discontinuous servitudes when the title creating same establishes limitations as to the mode of exercise.
As was stated at 33 La. Review 169 (1973):
The redactors of the 1825 Louisiana Code took the passage of Toullier out of context. In context, it is abundantly clear that Toullier speaks of the prescription of the mode of exercise of discontinuous servitudes. He did not deal with the different problem of the partial prescription of the area of the servitude by the prescription of non-use. Further, Toullier makes it clear that the prescription of the mode of exercise of the servitude is pertinent only if the title of the servitude contains limitations as to its mode of exercise. He says that
"if the servitude is not limited by its title...it is presumed to be unlimited; then the use of the servitude made during the night preserves the right to exercise it during the day, because a single act of exercise of the servitude preserves the whole of it, indefinite and unlimited, as it were: because, according to Article 707 [of the French Civil Code which corresponds with Article 790 of the Louisiana Civil Code of 1970] it is from the last day of enjoyment that the prescription begins to run."
Toullier is saying that the question of the prescription of the mode of servitude arises only when there are limitations in the title pertaining to the mode of exercise of the servitude. Article 798 of the Louisiana Civil Code then is applicable when the title creating a discontinuous servitude establishes limitations as to the mode of exercise, for example, by night, by day, by carriage, or on foot. If there are no limitations, there is no question of the prescription of the mode of exercise under article 798.
* * * * * *
Article 656 of the Civil Code establishes the principle that servitudes are indivisible. By virtue of this principle, implicitly adopted in France, and in other civil law jurisdictions, partial use of a servitude suffices ordinarily to keep the servitude alive as a whole....
* * * * * *
Upon conclusion, it is submitted that articles 796-97 of the Civil Code were intended to apply and do apply, to discontinuous servitudes in cases in which the exercise of the servitude is subject to limitations contained in the title. These articles have no application to continuous servitudes or to discontinuous servitudes *435 in the absence of limitations in the title.... In Louisiana, where the period of non-use is ten short years, there are additional reasons for a balanced interpretation of articles 796-98. It is only such an interpretation that will do justice to the scheme of the Code and to the text of Toullier, the actual source of these provisions. (Emphasis Added). "Work of the Louisiana Appellate Courts for the 1971-72 Term." 33 La.L.Rev. 169, 194-196 (1973).
Since the servitudes with which we deal in the case at bar are admittedly discontinuous and without limitation in their title, the Civil Code provisions cited by relators are inapplicable. We therefore determine that the applicable law with respect to this prescription issue and mode of use prior to the mineral code are the same as is now provided by that code at R.S. 31:40, which states: "An interruption of prescription applies to all types of minerals covered by the acts creating the servitude and to all modes of its use."

Decree
Accordingly, the judgment of the Court of Appeal is affirmed and the case remanded to the district court for the further proceedings directed by the Court of Appeal, consistent with the views expressed by this Court.
AFFIRMED; REMANDED TO THE DISTRICT COURT.

ON REHEARING
BLANCHE, Justice.
We granted a rehearing in this matter to reconsider our holdings concerning the scope of the mineral reservation and whether the right to search and capture the mineral lignite had prescribed for non-use notwithstanding the production of oil and gas.

Scope of the Mineral Reservation
As to this issue, we concede that the phrase "all mineral rights" is inherently ambiguous and the word "minerals" as defined in its broadest sense, would include anything not animal or vegetable and would even embrace the soil itself. Thus, the Court may examine extrinsic evidence to determine the intent of the parties when making the reservation. Huie Hodge Lumber Co. v. Railroad Lands Co., 151 La. 197, 91 So. 676 (1922).
We have taken cognizance of the reasons of both lower courts on this issue and acknowledge, as did the trial court, that the issue is a close one. Nevertheless, we prefer the exhaustive analysis made by the court of appeal concerning the contract negotiations leading to the reservation as determinative of the issue, and adopt that court's analysis of the evidence that the reservation of "all mineral rights" included the right to explore for and exploit lignite coal, a solid material.
At the risk of being redundant we adopt their conclusion on this issue as follows:
"Mansfield and Continental negotiated about the broadness of the term all mineral rights. Continental wanted to restrict the term to exclude earth, sand and gravel. Mansfield wanted to keep it unrestricted.
"The digging of earth, sand and gravel certainly was contemplated as being included in the term all mineral rights. Lignite and other solid minerals are not excluded and the digging of lignite must be deemed to have been within the contemplation of the parties." The Continental Group, Inc. v. J. L. Allison, Jr., et al., 379 So.2d 1117 (2nd Cir. 1979), at p. 1130.

The Prescription Issue
Plaintiff's success on the scope of the reservation issue is short-lived, for we now reverse our earlier position on the prescription issue and find that the plaintiff's right to search for and capture lignite had prescribed for ten years' nonuse notwithstanding the production of oil and gas.
By way of review, we note that the court of appeal based its finding on the case of GMB Gas Corp. v. Koch, 340 So.2d 638 (2nd Cir. 1976), which directed that the provisions *436 of the Mineral Code should be followed on pre-code issues which have not been clearly resolved by the jurisprudence. Believing the matter had not been clearly resolved, they applied R.S. 31:40, which provides, "An interruption of prescription applies to all types of minerals covered by the act creating the servitude and to all modes of its use." Clearly, under this provision, the production of oil and gas would suffice to interrupt prescription for the strip-mining of lignite.
We were correct in not applying R.S. 31:40 retroactively as did the court of appeal, for the prior law was not the same[1] and since the effective date of the Mineral Code was January 1, 1975, by that time, whatever rights plaintiff had were vested. As the Mineral Code itself provides:
"The provisions of this article shall apply to all mineral rights, including those existing on the effective date hereof; but no provision may apply to divest already vested rights, or to impair the obligation of contracts." R.S. 31:214.
Concerning the court of appeal's application of the logic as expressed in GMB Gas Corp., supra, we respond by quoting the following excerpt from 38 La.L.Rev. 378 (1978):
"An inquiry into the meaning of the old law should be guided by article 1 of the Civil Code, which states `Law is a solemn expression of the legislative will.' Therefore, in seeking to ascertain whether new law has destroyed rights under old law, courts must do more than merely examine whether there is a four-square case in point. Rights long established under the Civil Code or legislation are often so clearly vested that there is no need for controversy or litigation. Legislation, as much as any case, can vest rights. Therefore, future decisions ought to analyze Civil Code regimes antedating the Mineral Code, irrespective of jurisprudence or the absence thereof."
Thus, as we did in our original opinion, we look to the pertinent articles of the Civil Code that were in effect when the servitude was made in 1956, and when the right to strip-mine for lignite under said servitude prescribed in 1966. Those articles are C.C. art. 796 and art. 798.[2]
"Article 796. The mode of servitude is subject to prescription as well as the servitude itself, and in the same manner.

*437 "By mode of servitude, in this case, is understood the manner of using the servitude as is prescribed in the title."
* * * * * *
"Article 798. If, on the contrary, the owner has enjoyed a right less extensive than is given him by his title, the servitude, whatever be its nature, is reduced to that which is preserved by possession during the time necessary to establish prescription."
In our original opinion while addressing the prescription issue, we were incorrect in holding that these articles were inapplicable. We held that the mineral servitude here at issue is a discontinuous servitude which is unlimited by title as to its exercise, whereas Articles 796-799 are applicable only to discontinuous servitudes when the title creating same establishes limitations as to the mode of exercise. We then concluded that the preferred interpretation of the law as it was before passage of the Mineral Code was that oil and gas production would interrupt prescription as to the digging of solid minerals. We now find this conclusion was erroneous.
In previous cases, this Court and our lower courts have used these articles to decide mineral right controversies. As we said in Trunkline Gas Co., et al. v. Steen, et al, 249 La. 520, 187 So.2d 720 (1966):
"In the evolution of the mineral law in the State, it was recognized that the sale or reservation of a mineral right, having been classed as a servitude, was subject to the applicable articles of the Civil Code in the resolution of conflicting claims; and in deciding the early and landmark case of Ohio Oil Co. v. Ferguson [213 La. 183, 34 So.2d 746], supra, the precedent upon which succeeding decisions, including Childs v. Washington [229 La. 869, 87 So.2d 111], supra, and Jumonville Pipe and Machinery Co. v. Federal Land Bank [230 La. 41, 87 So.2d 721], supra, were predicated, we concluded the articles of the Civil Code in Title IV, entitled "Of Predial Servitudes or Servitudes of Land", whenever applicable were controlling."
The landmark case referred to, Ohio Oil Co. v. Ferguson, et al, 213 La. 183, 34 So.2d 746 (1946) used the Civil Code in determining a mineral owner's rights. There it was found that the servitude owner had enjoyed a right less extensive than that which was given him by his title and, hence, the servitude was reduced to that which was preserved by his use or possession during the time necessary to establish prescription. The case cited articles 798 and 803. In the present case, we have a similar situation. The defendant had the right by title to all minerals (including lignite); however, he only enjoyed that right to produce oil and gas. Hence, his mineral servitude should be reduced to oil and gas.
Admittedly, there are no cases exactly on point with the issue at hand. However, prior jurisprudence concerning the preservation of servitudes by use provides us with the simple proposition that if you don't use it, you lose it, and if you don't use it well enough, you lose it. While this is probably an oversimplification of the issue, the following cases reflect this position when dealing with mineral servitude cases.
Louisiana Petroleum Co. v. Broussard, et al, 172 La. 613, 135 So. 1 (1935) is an example of not exercising the servitude in the proper manner so as to interrupt prescription. The servitude in question gave unto the grantees a right to search for oil and gas. The grantees, although exploiting for oil and gas, stopped or abandoned their effort at a depth at which there was no reasonable hope of discovering minerals in paying quantities. In concluding that the grantees had lost their servitude, the court held:
"To use a servitude, so as to interrupt prescription, is to use it in the manner contemplated by the grant or reservation. This ruling finds support in articles 796 to 800, inclusive of the Civil Code, touching the mode of use of servitudes and in connection therewith, prescription. The servitude, in this instance, was granted for the purpose of exploring for oil, gas, and other minerals, and converting them to possession, if they were discovered, and *438 the servitude existed for that purpose. Reference must therefore be made to the object of the grantnot for the purpose of determining whether there has been a breach of any obligation that might exist to develop, but to determine whether there has been such use as to interrupt prescription."
In Goldsmith v. McCoy, et al, 190 La. 320, 182 So. 519 (1938), the court followed Broussard, supra, and held that a geophysical exploration for the purpose of determining by scientific methods the indication of minerals underlying the surface was not use of the servitude in the manner contemplated by the grant thereof and, accordingly, such activity did not interrupt prescription.
Analogous to this situation are the cases involving pipelines and the prescription of the right to lay them more than ten years after the construction of the first line. In the expropriation case of Columbia Gulf Transmission Co. v. Fontenot, 187 So.2d 455 (3rd Cir. 1966), that court held the transmission company's failure to construct any additional lines during a ten year period constituted a use less extensive than that given it by its title, and consequently, the transmission company lost by prescription any rights it had under the agreements to construct additional lines. The court cited articles 796 and 798. Using this logic in Dickerson v. R.J.M. Pipeliners, Inc., et al., 331 So.2d 501 (2nd Cir. 1976), another circuit found the defendants had not used their right to lay additional gas transmission lines on plaintiff's property; thus, their right had prescribed. Both cases are examples of the use of C.C. arts. 796 and 798 and our simplification of their reading that if you don't use the servitude you lose it. Such was the situation with our immediate case.
These cases are but examples of the use of the Civil Code articles in dealing with mineral servitudes and like situations regarding their prescription for non-use. We now find that, since the right to explore and capture lignite was not used, the defendant's mineral servitude to strip-mine for lignite expired in 1966. Since that time, the plaintiff, as landowner, has been in possession of this prescribed right.
We base this conclusion on the fact that absolutely no mode of use even vaguely resembling strip-mining was performed by the defendants during their ten year prescriptive period. Since the mode of servitude is subject to prescription as well as the servitude itself (art. 796), we find the right to strip-mine for lignite has prescribed. Furthermore, since the defendants enjoyed the right by title to "all mineral rights" and only drilled for oil and gas, their servitude is reduced to that which they preserved (art. 798).
For the above reasons, the decisions of the Second Circuit Court of Appeal and this Court on original hearing are reversed. Plaintiff's request for a declaratory judgment limiting defendant's servitude to the right to explore for and exploit oil, gas and kindred minerals is granted. The right to explore for and strip-mine for the solid mineral lignite is granted to the plaintiff. All costs of these proceedings are to be paid by the defendants.
REVERSED.
DIXON, C.J., concurs with reasons.
CALOGERO, J., dissents. The opinion correctly resolves the all mineral rights issue but incorrectly decides the prescription issue. I subscribe to the opinion on the original hearing.
DENNIS, J., concurs with reasons.
LEMMON, J., concurs and will assign reasons.
WATSON, J., dissents, being of the view that the original opinion was correct.
DIXON, Chief Justice (concurring).
I respectfully concur. Although "all mineral rights" is all-inclusive, it is not ambiguous, in my view. The difference, however, does not affect the outcome of this case. Further, I concur in holding that, before the effective date of the Mineral Code, C.C. 796 and 798 provided that prescription running against the servitude may be interrupted *439 only in the manner used "as is prescribed in the title."
DENNIS, Justice, concurring.
I respectfully concur in the result.
Although I endorsed the majority's position regarding the scope of the mineral reservation upon original hearing, I am now convinced that the approach taken in determination of the parties' intent was an unwarranted departure from sound principles of contractual construction. Abandonment of the precepts generally utilized in the past will have an unsettling effect on the law of immovable property in this state. I am unwilling to again embrace the approach on rehearing, although I concur in the result and the decree.
The 1956 reservation of "all mineral rights" was said not to be ambiguous on original hearing. The majority on rehearing recognizes that the phrase is inherently ambiguous. I agree. I disagree with the manner in which the majority resolves that ambiguity.
In interpreting contracts we are guided by Louisiana Civil Code articles 1945-62 comprising the chapter entitled "Of the Interpretation of Agreements." Article 1959 provides:
"However general be the terms in which a contract is couched, it extends only to the things concerning which it appears that the parties intended to contract."
While the objective of the court should be to determine the actual subjective intent of the parties, nevertheless the very fact that the parties used general or indefinite language is indicative of the fact that the parties probably did not, at the time of their agreement, have a specific understanding as to exactly what their contract was intended to comprehend.
It is undisputed that lignite deposits in North Louisiana were not commercially exploitable at the time this servitude was created. It is unrealistic and unreasonable to assume that the parties intended that the use and utility of the surface of the property, critical to the needs of the landowner, could be destroyed if at some future time it should become economically feasible to mine a mineral not presently commercially exploitable absent a clear and affirmative expression to that effect. This court has frequently arrived at a narrow construction of broadly-worded mineral reservations in part by reliance on this commercial exploitability notion. E.g., Holloway Gravel Co., Inc. v. McKowen, 200 La. 917, 9 So.2d 228 (1942); Huie Hodge Lumber Co. v. Railroad Lands Co., 151 La. 197, 91 So. 676 (1922). See also, River Rouge Minerals, Inc. v. Energy Resources of Minnesota, 331 So.2d 878 (La.App.2d Cir. 1976). Cf. Delahoussaye v. Landry, 3 La.Ann. 549 (1848).
It is unreasonable to believe that parties, because of the size of their legal staffs or the length of their negotiations, must have intended the servitude in question to include the right to strip mine lignite when that minerial did not become commercially exploitable until decades later due to unforeseeable economic and political upheavals. It would be more realistic for this court to presume that parties which use general and indefinite terms in their agreements are contemplating the inclusion of only those minerals which are commercially exploitable at that point in time. This is not to say that parties who foresee that a natural resource may one day become commercially exploitable cannot specifically contract for the right to search for and produce that resource. Rather, it is my contention that this court should not provide mineral lessees with a windfall merely because the parties utilize the inherently ambiguous phrase "all mineral rights" in their contracts. Mineral contracts which are not utilized in a reasonable manner for the exploration of and production from servient estates, should not be allowed to remain as charges upon the land for purely speculative purposes.
Narrowly construing ambiguous mineral reservations is also consistent with the general civilian principle of resolving doubt in favor of the free use and alienability of immovable property. McGuffy v. Weil, 240 La. 758, 125 So.2d 154, 158 (1960); Domat, Les lois civiles dans leur ordre naturel, 1 *440 Oeuvres de Domat 329 (ed. Remy 1828); 2 Toullier, Droit civil francais 192 (1833). Civil Code article 730 clearly states (as did article 753 before it) that: "Doubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate." It is a cardinal rule of interpretation that, in case of doubt, instruments purporting to establish predial servitudes are always interpreted in favor of the owner of the property to be affected. La.C.C. art. 730, Comment (b). This court has repeatedly declared that "servitudes are restraints on the free disposal and use of property, and are not, on that account, entitled to be viewed with favor by the law." Parish v. Municipality No. 2, 8 La.Ann. 145, 147 (1853), cited with approval in Buras Ice Factory, Inc. v. Department of Highways, 235 La. 158, 103 So.2d 74 (1958).
On this admittedly close issue of the scope of the mineral reservations, the majority has declined to follow the sound and established principles of construction because of the "particular and unusual facts" in this case. On original hearing this court stated that it did not intend or envision its decision to have great import in other contexts and cases. I cannot agree that the impact of the decision will be so limited. Rather, it seems to me that in areas with lignite mining potential, the scope of each mineral reservation or conveyance now may be decided only after exhaustive case by case examinations of the parties' negotiations in an effort to divine their intentions on a subject that they probably never thought about. Such an approach can only lead to confusion, instability and ultimately to a less efficient, more costly development of this state's lignite deposits.
NOTES
[1] The damage provision reads:

"...The Vendor shall pay the Vendee for all damage done to timber, wood or other forest products or the property of the Vendee on the lands conveyed hereunder ... in connection with operations by the Vendor ... in the course of such exploitation and shall assume the payment of, and pay any taxes levied on all minerals produced from such operations, or the increase in the value of the land, if any, caused thereby or by the equipment placed thereon in connection with such exploitation."
[2] Coal is classified by its transformation from moist organic matter through bituminous to the hard, highly sought-after anthracite. Lignite is of the lowest rank of coals, being a brown substance intermediate between peat and bituminous coal. The name is derived from lignum, from the Latin for wood, because the texture of the original wood is often discernible in the coal. Encyclopaedia Britannica, Vol. 4, (1974); Helen Hemingway Benton, Pub.
[3] In brief and in oral argument to this Court, plaintiff has repeatedly urged that at the time of the sale in question, the Robert Gair Company was first and last a lumber company, concerned only with the timber on the surface of the land.
[4] Black states:

"In the construction of laws, wills, and other instruments, the `ejusdem generis rule' is, that where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned." [Citations omitted.]
Black's Law Dictionary 608 (4th ed.rev. 1968)
[5] It should be noted, however, that relator does not attempt to void the sale, only to interpret it provisions contrary to its verbiage.
[6] A part of the Court of Appeal reasoning is as follows:

In addition to the 93,000 acres acquired from Mansfield and the defendants, Continental owns more than 200,000 acres of timberland in North Louisiana and South Arkansas. From its total 300,000-plus acres, Continental annually harvests timber from non-contiguous tracts on 7,000 to 10,000 acres, sometimes selectively cutting and sometimes clear-cutting. Continental fully reforests (replants) the acres which it clear-cuts. About 1/30 of its total acreage is harvested annually to allow full regrowth in approximately 30 years. Plaintiff's forester testified that plaintiff's harvesting and restoration program could work around a mining plan. The Continental Group, Inc. v. J. L. Allison, Jr., et al., 379 So.2d 1117 at 1127 (La.App. 2d Cir. 1979).
[7] Those Louisiana Civil Code articles, all of which have since been repealed, appeared as follows:

Art. 796. The mode of servitude is subject to prescription as well as the servitude itself, and in the same manner.
By mode of servitude, in this case, is understood the manner of using the servitude as is prescribed in the title.
Art. 797. If he to whom a servitude is due enjoys a right more extensive than that which is given him by the act establishing the servitude, he will be considered as having preserved his right of servitude; because the less is included in the greater.
But he can not thus prescribe for the surplus, and can be compelled to confine himself to the exercise of the servitude granted by his title, unless it be a continuous apparent servitude, which he has acquired by prescription.
Art. 798. If, on the contrary, the owner has enjoyed a right less extensive than is given him by his title, the servitude, whatever be its nature, is reduced to that which is preserved by possession during the time necessary to establish prescription.
Art. 799. If the owner has merely enjoyed an accessory right, which was necessary to his right of servitude, he will not be considered as having used his right of servitude.
For example, if he who has the right of drawing water from the well of his neighbor, has passed often through the land of the latter, and gone to the well without drawing water during the time required for prescription, he will have lost his right of drawing water without acquiring that of passage, which was merely accessory to the right of drawing water.
[1] Defendants rely heavily on the testimony of George W. Hardy III, who said R.S. 31:40 did not change prior law. Such a definite position has not always been espoused by him, as he wrote in 32 La.L.Rev. 557 (1972):

"Mode of UseOne of the lingering doubts concerning the law applicable to mineral servitudes, and perhaps mineral royalties as well, concerns the possible application of those articles of the Civil Code which contemplate that predial servitudes may be reduced by a use less extensive than that granted by the original title and those which provide that certain modes of use of servitudes may prescribe."
Furthermore, the official comments to R.S. 31:40 clearly reflect that the authors of the new article feared the use of the prior law, as they said:
"Article 796 of the Civil Code provides that the mode of servitude is subject to prescription as well as the servitude itself. Article 40 assures that article 796 of the Civil Code will not be applicable to mineral servitudes unless parties made some express agreement regarding prescription of mode of use...
"Article 798 of the Civil Code provides that if a servitude is used less extensively than the right given in the title creating it, the servitude is reduced to that which is preserved by possession during the prescriptive period. This article has not been applied to a mineral servitude except in the case of Ohio Oil Co. v. Ferguson, 213 La. 183, 34 So.2d 746 (1948), in which the servitude owner sold to another all of his rights in a specified portion of the servitude tract. However, the question of the applicability of this article where only one mineral has been produced during the prescriptive period has not been raised in the jurisprudence. The intent of article 40 is to assure that article 798 of the Civil Code will not be applied to limit the extent of an interruption by operations for discovery and production of or actual production of one mineral."
[2] Both C.C. art. 796 and art. 798 were repealed effective January 1, 1978 by Acts 1977, No. 514.

For the sources of articles 796-798, see: Louisiana Legal Archives, Project of the Civil Code of 1825, p. 91 (1937); Domat, Part I, Book I, Tit. 12, Sec. 6, No. 5; Toullier, Vol. 3, no. 700.